802 A.2d 1070

MAYOR AND CITY COUNCIL OF BALTIMORE,

v.

UTICA MUTUAL INSURANCE COMPANY, et al.

No. 866, Sept. Term, 2000.

Court of Special Appeals of Maryland.

July 2, 2002.

260

262

Bruce Goldstein and Carl E. Tuerk, Jr. (Cooper & Tuerk, LLP, on the brief), Baltimore; Brian T. Fitzpatrick and Jonathan Siegal (Stanley J. Levy, Alani Golanski and Levy, Phillips & Konigaberg, on the brief), New York, NY, for appellant.

Laura A. Foggan, Daniel E. Troy, Richard A. Ifft, Stephen C. Tosini and Wiley, Rein & Fielding for amicus curiae, Insurance Environmental Litigation Ass'n.

Lon A. Berk (James P. Bobotek and Shaw Pittman LLP, on the brief for appellee, Utica), McLean, VA; Paul Farquharson (Margaret Fonshell Ward and Semmes, Bowen & Semmes, on the brief, for appellee, Federal Insurance Co.), Baltimore; Harry Lee (John O'Connor and Steptoe & Johnson, on the brief, for appellee, St. Paul), Washington, DC.

Linda Woolf (Jason Rose and Goodell, Devries, Leech & Gray, on the brief, for appellees, Zurich Insurance Company

and American Guarantee and Liability Insurance Company), Baltimore.

(Gregory A. Krauss, Mark A. Collins and McDermott, Will & Emery, for appellee, Continental Insurance Company), Washington, DC.

(Donald L. Uttrich and Jackson & Campbell, P.C., for appellee, National Union Fire Insurance Company), Washington, DC.

Argued before MURPHY, C.J., and HOLLANDER and RAYMOND G. THIEME, JR., (Retired, Specially Assigned), JJ.

MURPHY, Chief Judge.

The issues in these consolidated appeals from the Circuit Court for Baltimore City arise out of an omnibus pre-trial Order entered on May 16, 2001 by the Honorable Gary I. Strausberg in multiple garnishment proceedings initiated by the Mayor and City Council of Baltimore ("City") against several insurance companies ("garnishees" or "insurers") that provided liability coverage and excess coverage to Croker, Inc. ("Croker"), a subcontractor who installed asbestos-containing thermal insulation products in public buildings.

## Summary

As a result of the pre-hearing conference held pursuant to Maryland Rule 8–206, this Court issued an Order calling upon the parties to address the following rulings:

1. Ruling on Insurers' Motion to Set Aside or, in the Alternative, to Revise the Consent Judgment;

2. Ruling on Zurich [Insurance Company]'s Motion for Summary Judgment Based on the Products Hazard Exclusion;

3. Ruling on Utica Mutual [Insurance Company]'s Motion for Summary Judgment on the Issues of Trigger of Coverage and Allocation, which other Insurers joined;

4. Ruling on U.S. Fire Insurance Company's Motion for Summary Judgment (based on absence of policy);

5. Ruling on Federal Insurance Company's Motion for Summary Judgment (based on exhaustion); and

6. Ruling on Insurers' Motion to Strike Plaintiff the Mayor & City Council of Baltimore's Jury Demand.

We hold that in garnishment proceedings, summary judgment in favor of a particular garnishee is a final judgment as to that garnishee. We shall deny the garnishees' motion to dismiss the City's appeals from the entries of summary judgment based on the products hazard exclusion, on allocation, and on trigger of coverage.

We shall dismiss the City's appeals from the order striking its jury request, and from the court's refusal to deny garnishees' request to reopen the consent judgment. We shall also dismiss the cross-appeals filed by Utica Mutual.

We conclude that the products hazard exclusion applies to claims of negligent failure to warn, and therefore affirm the entry of summary judgment in favor of American Guarantee and Liability Insurance Company and Zurich on that issue, as to primary and umbrella policies for the period from September 5, 1979 through September 5, 1980, and the primary policy for the period from September 5, 1980 to June 2, 1981. We vacate the entry of summary judgment as to the Zurich umbrella policy for the September 5, 1980 to September 5, 1981 period, because of a significant discrepancy in the record with regard to the correct policy number for the products hazard exclusion, and remand this issue to the circuit court for further consideration.[1]

---

1. Summary judgment was granted in favor of Zurich on the basis of the products hazard exclusion for only part of its September 5, 1980 to September 5, 1981 policy period. The interval from June 3 to September 3, 1981 was not embraced by this order because Zurich apparently provided products liability coverage for this time. But the circuit court, in its decision to enter summary judgment on the manifestation and trigger of coverage issues, absolved from liability those insurers whose coverage periods began after December 31, 1980. The net effect was to end the litigation with respect to Zurich.

We conclude that an injury-in-fact/continuous trigger of coverage is applicable for long term and continuing damage posed by the installation and continued presence of asbestos in buildings, and shall therefore vacate the circuit court's judgment in favor of insurers whose coverage began after December 31, 1980. We remand this issue for further proceedings consistent with our opinion.

We conclude that liability for the damages claimed in this matter shall be allocated—on a pro rata basis from the perspective of time on the risk—among triggered primary insurance policies and periods of self-insurance *(viz.,* when Croker was either "self-insured" or chose not to buy products liability coverage that was available). We shall affirm the entry of summary judgment in favor of Federal Insurance Company on the issue of exhaustion because we have determined that as a matter of law that, under an appropriate allocation and horizontal exhaustion rule, Federal's excess policy will not be reached.[2]

### Background

These appeals represent yet another chapter in asbestos-abatement litigation that commenced on September 24, 1984, when the City sued numerous entities deemed responsible in some manner for the installation of asbestos-containing building materials (ACBMs) in certain city buildings.[3] According to the City, the various defendants should be held responsible for the cost of removal, management, abatement or remediation of ACBMs.[4] With the parties' consent, the circuit court

---

2. In reaching this conclusion, we have not relied upon the Appendix that has been attached to Federal's brief, and we hereby grant the City's motion to strike this document.

3. *Mayor & City Council of Baltimore v. Keene Corporation, et al.,* Case. No. 84268068/CL25639. The circuit court docket sheet reflects 63 defendants. The City claimed entitlement to punitive and compensatory damages under theories of strict liability, negligence, breach of warranties (express and implied), nuisance, fraud, and civil conspiracy. On March 8, 1989, the City filed an Amended Complaint.

4. This type of litigation has been described as follows:

divided the case into separate proceedings based on the nature of the asbestos product that had been installed: "Group I" involved surface treatment products; "Group II" involved thermal insulation products; and "Group III" involved flooring materials.[5] The Group III litigation settled prior to trial.

On June 5, 1992, a jury returned verdicts in favor of the City against three of the Group I defendants-United States Gypsum Company, Hampshire Industries, Incorporated and Asbestospray Corporation,[6] awarding (1) compensatory dam-

---

Until roughly the mid–1970s, the use of asbestos-containing material for fireproofing and soundproofing was an accepted, and often required, specification in building construction. In the last decade, however, the well-recognized utility of these products has been overshadowed by the potential health hazard to human beings exposed to asbestos fibers. Concern over the effects of exposure to asbestos fibers has resulted in a maze of Federal and State regulations requiring local educational facilities and other public building owners to identify the presence of asbestos in their buildings and take corrective measures to contain or remove the asbestos products from their buildings. See, e.g., 20 U.S.C. § 3601 *et seq.* (1988); 40 C.F.R. § 763 (1990); Ill.Rev.Stat.1985, ch. 122, par. 1401 *et seq.*

These regulations have resulted in mass litigation brought by these building owners against the whole "asbestos industry" to recover the costs associated with the inspection, removal from and/or replacement of asbestos in their buildings. . . .

*United States Fidelity & Guarantee Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 70–71, 161 Ill.Dec. 280, 283, 578 N.E.2d 926, 929 (1991).

5. Grouping of asbestos defendants by product types is not uncommon in the management of complex asbestos litigation. *See, e.g., Commonwealth v. Johnson Insulation*, 425 Mass. 650, 651, 682 N.E.2d 1323, 1325 (1997). Asbestos in building materials "falls into three main categories: (1) sprayed or troweled on materials . . . ; (2) insulation around pipes . . . thermal systems installation (TSI); and (3) other miscellaneous products, such as . . . tile[.]" 5 GEORGE A. PETERS AND BARBARA J. PETERS, SOURCEBOOK ON ASBESTOS DISEASES MEDICAL LEGAL AND ENGINEERING ASPECTS 70 (1991). As previously recognized by this Court, "all asbestos-containing products cannot be lumped together in determining their dangerousness." *ACandS, Inc. v. Abate*, 121 Md.App. 590, 631 n. 28, 710 A.2d 944, 964 n. 28 (quoting *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir.1985)), *cert. denied sub nom. Crane v. Abate*, 350 Md. 487, 713 A.2d 979 (1998), *cert. denied sub nom. John Crane, Inc. v. Abate*, 525 U.S. 1171, 119 S.Ct. 1096, 143 L.Ed.2d 95 (1999).

6. All of the other Group I defendants either settled with the City or were successful in defending the City's claims against them.

ages against all three defendants in the amount of $17,208,807.14, and (2) punitive damages in the aggregate amount of $6,000,000 against United States Gypsum ($4,000,-000) and Asbestospray ($2,000,000). The circuit court entered a final judgment on that verdict, and the defendants noted appeals. While the appeals were pending in this Court, the Court of Appeals issued a writ of *certiorari*.

In *United States Gypsum Co. v. Mayor & City Council of Baltimore*, 336 Md. 145, 647 A.2d 405 (1994), while upholding the compensatory damage award and reversing the punitive damage award, the Court of Appeals held that (1) tort remedies were available to the City in this action for property damage,[7] (2) the defendants were under a continuing duty to warn of product defects after the moment of installation and sale,[8] and (3) the defendants would be held responsible for general "state of the art" knowledge about the hazards posed by their product.[9]

The Court of Appeals had another occasion to conduct a direct review of Group I proceedings when two insurance companies, North River Insurance Company and United States Fire Insurance Company, as garnishees in the City's attempt to collect the Group I award against Asbestospray, appealed a default judgment.[10] *North River Insurance Co. v. Mayor & City Council of Baltimore*, 343 Md. 34, 680 A.2d 480 (1996).

---

7. *Id.* at 158, 647 A.2d at 411.

8. *Id.* at 160–61, 647 A.2d at 412–13.

9. *Id.* at 163–69, 647 A.2d at 414–16.

10. That judgment, in the amount of $10,351,412.44, included the compensatory damages award, and a $335,981.66 counsel fee award against Asbestospray and its counsel as sanctions for discovery violations. The Court vacated the imposition of sanctions for the discovery violations and remanded the matter for further proceedings. The Court noted, but did not resolve, the coverage issues involved in the litigation of that garnishment action.

## The City–Croker Settlement

The issues before us arise out of a settlement reached in the Group II litigation.[11] One of the Group II defendants was Croker, a subcontractor that installed asbestos thermal insulation in a number of Baltimore City public buildings.[12] Settlement discussions between Croker and the City were conducted throughout 1993, and the parties reached a settlement on December 29, 1993. A consent judgment for $5,018.989.44 was filed in the circuit court on January 4, 1994. The City is now attempting to collect this amount, plus applicable interest, from the insurance companies that provided coverage to Croker during the period of time that is relevant to this litigation.

The City requested the issuance of writs of garnishment against insurance proceeds and credits allegedly payable to Croker by a number of its insurance carriers. The writs were executed and the garnishees filed timely answers thereto. The City in turn replied.[13] The issues thus joined, the parties

---

11. The Group II trial commenced on January 4, 1993, after which a jury awarded compensatory damages in the amount of $4,448,665.04 and $2,600,000 in punitive damages against Owens Corning Fiberglas Corporation and Keene Corporation. On appeal, this Court reversed the punitive damages award and upheld the judgment awarding compensatory damages. *Owens–Corning Fiberglas Corp. v. Mayor & City Council of Baltimore*, 108 Md.App. 1, 670 A.2d 986 (1996).

12. A successor to Croker & Stallings, Inc., Croker is presently known as "Belvedere Insulation, Inc." *See St. Paul Fire & Marine Insurance Co. v. Croker, Inc.*, 21 F.Supp.2d 537, 538 n. 1 (D.Md.1998).

13. Md. Rule 2–645 governs the garnishment of property. It reads in pertinent part:
 (a) Availability. This rule governs garnishment of any property of the judgment debtor[.] ... Property includes any debt owed to the judgment debtor, whether immediately payable, unmatured, or contingent.
 (b) Issuance of writ. The judgment creditor may obtain issuance of a writ of garnishment by filing in the same action in which the judgment was entered a request that contains (1) the caption of the action, (2) the amount owed under the judgment, (3) the name ... of each judgment debtor ..., and (4) the name ... of the garnishee. Upon the filing of the request, the clerk shall issue a writ of garnishment directed to the garnishee.
 * * *

filed a host of pre-trial motions,[11] and the appeals now before us stem from Judge Strausberg's rulings on certain of those motions.[15]

## The Circuit Court's January 21, 2000 Order

Zurich Insurance Company, joined by American Guarantee Insurance Company,[16] moved to set aside the consent judg-

---

(e) Answer of garnishee. The garnishee shall file an answer within the time provided by Rule 2–321.... The garnishee may assert any defense that the judgment debtor could assert....
* * *
(g) When answer filed. If the garnishee files a timely answer, ... [and] a timely reply is filed to the answer of the garnishee, the matter shall proceed as if it were an original action between the judgment creditor as plaintiff and the garnishee as defendant and shall be governed by the rules applicable to civil actions.
* * *

Md. Rule 2–645(b), (e), (g)

14. "Motion of Zurich Insurance Company and American Guarantee and Liability Insurance Company to Set Aside or, in the Alternative, to Revise the Consent Judgment," filed on November 24, 1999; "Cross Motion of the Mayor and City Council of Baltimore to Strike the Insurers' Affirmative Defenses which attack the Croker Judgment," filed December 21, 1999; "Defendant Utica Mutual Insurance Company's Motion for Summary Judgment on the lost Policy Issue," filed January 14, 2000; "Defendant Utica Mutual Insurance Company's Motion for Summary Judgment on the Issues of Trigger of Coverage and Allocation," filed January 14, 2000; "Motion of Garnishee United States Fire Insurance Company for Summary Judgment," filed January 14, 2000; "Defendant Federal Insurance Company's Motion for Summary Judgment," filed January 14, 2000; "Zurich Insurance Company's and American Guarantee and Liability Insurance Company's Motion for Summary Judgment based on the Products Hazard Exclusion," filed January 18, 2000; "Garnishee Defendant Utica Mutual Insurance Company's Motion to Strike Plaintiff the Mayor and City Council of Baltimore's Jury Demand and Memorandum in Support Thereof," filed February 25, 2000.

15. Despite that Order, and the resulting appeals and cross-appeals, a trial date had been set for July 10, 2000. Because of Judge Strausberg's untimely death, however, the case was reassigned to the Honorable Stuart Berger. The Circuit Court docket reflects that after Judge Strausberg entered his May 16 Order, other insurers filed motions for summary judgment, some based on policy exclusions similar to those addressed by the Circuit Court in its May 16 Order.

16. The Zurich Insurance Company is the ultimate parent of American Guarantee & Liability Insurance Company. *See Croker, Inc.,* 21

ment, and the City filed a Cross–Motion to Strike Insurers' Affirmative Defenses. In a Memorandum Opinion filed on January 21, 2000, while rejecting the City's arguments that (1) the carriers lacked standing to challenge the consent judgment for fraud, and (2) the garnishees were precluded from contesting that Judgment by "principles of finality," Judge Strausberg concluded that

> Zurich is not entitled to the relief it seeks as a matter of law as there is a genuine dispute as to material facts. Md. Rule 2–501. Whether all or part of the consent judgment was procured by fraud or collusion is an open issue not susceptible to resolution as a matter of law at this point in time.

### The Circuit Court's May 16, 2000 Order

The parties continued to skirmish over pre-trial motions. On April 17 and May 2, 2000, Judge Strausberg held hearings on their legal arguments. In a Memorandum Opinion filed May 16, 2000, Judge Strausberg (1) granted a majority of the garnishees' motions for summary judgment,[17] (2) deferred

---

F.Supp.2d at 541.

17. Judge Strausberg (1) granted the Motion for Summary Judgment filed by Federal Insurance Company, which had sought to escape indemnity liability on the grounds that the City had failed to demonstrate that the coverage from Federal's excess liability policy would be reached, (2) granted summary judgment in favor of United States Fire Insurance Company in all respects, ruling that there was no genuine issue of material fact regarding the coverage afforded by insurance policies that were not in evidence, and further holding that there was evidence "support[ing] the conclusion that U.S. Fire did not provide coverage over the damages at issue in this litigation," (3) granted summary judgment in part to Zurich and American Guarantee on the basis of the "Products Hazard Exclusion" in their primary and excess CGL policies for the coverage periods from September 5, 1979 to September 5, 1980, and September 5, 1980 through June 2, 1981 (although the period between June 3 and September 5, 1981, was not covered by the exclusion, the circuit court found for Zurich and American Guarantee with respect to that interval in its entry of summary judgment on the issue of trigger of coverage), and (4) summary judgment in favor of Zurich and St. Paul Fire & Marine Insurance Company with regard to policies that covered Croker after December 31, 1980, on the ground that there was no liability for coverage periods

ruling on Zurich's motion to set aside the consent judgment, (3) struck the City's demand for a jury trial, and (4) denied the City's Motion to Strike the garnishees' affirmative defenses. These appeals and cross-appeals followed.

## Jurisdiction

As a preliminary matter, we must determine whether we have jurisdiction pursuant to Maryland Code (1974 and 1998 Repl.Vol.), §§ 12–301, 12–308 of the Courts and Judicial Proceedings Article. Before the Court is a motion to dismiss the City's appeals, filed by American Guarantee, Zurich, U.S. Fire and St. Paul Fire & Marine.[18] According to these appellees, the City has no right to note its numerous appeals from nonfinal judgments that have not resolved all of the claims against all of the parties in this garnishment proceeding. According to the City, because the garnishment proceedings have been initiated against separate insurers, and are separate and distinct from one another, summary judgment as to a particular insurer constitutes a final, appealable, judgment that has effectively ended the litigation against that insurer.[19] The City also argues for dismissal of the cross-appeals filed by

_____

after the discovery or manifestation of property damage, which occurred "at the latest" in 1981.

: Judge Strausberg denied two motions of Utica Mutual Insurance Company, the first seeking summary judgment on the grounds that the City failed as a matter of law to prove the existence of an insurance policy for the three year period from September 5, 1976 through September 5, 1979 (the "Missing Policy"), and the second urging summary judgment on the basis that the City failed to prove either specific periods of damage or that proof of this would be technologically infeasible (the "trigger of coverage and allocation of indemnity liability issues"). U.S. Fire has settled with the City.

**18.** Appellees Federal Insurance Company, American Guarantee and Liability Insurance Company, St. Paul Fire & Marine Insurance Company, and National Union Fire Insurance Company have filed or joined the Brief in Support of the dismissal of these appeals.

**19.** In the alternative, the City urges us to exercise our discretion to enter a final judgment pursuant to Md. Rule 8 602(e). Finally, the City contends that the Circuit Court's Order granting the Motion to Strike Jury Demand constitutes an appealable collateral order.

Utica Mutual Insurance Company from the circuit court's refusal to grant Utica's motions for summary judgment.

## The Final Judgment Rule

Maryland Rule 2–602, in pertinent part, provides:

(a) *Generally.*—Except as provided in section (b) of this Rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:

(1) is not a final judgment;

(2) does not terminate the action as to any of the claims or any of the parties; and

(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

(b) *When allowed.*—If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:

(1) as to one or more but fewer than all of the claims or parties; . . .

The Court of Appeals has recently reaffirmed the well-established rule that, subject to certain exceptions,

an appeal may be taken to the Court of Special Appeals under Maryland Code, § 12–301 of the Courts and Judicial Proceedings Article, only from a "final judgment entered in a civil or criminal case by a circuit court." In construing that statute, we have held that, if a ruling of the Circuit Court is to constitute a final judgment, it must, among other things, be an "unqualified, final disposition of the matter in controversy." *Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767, 773 (1989); *Davis v. Davis,* 335 Md. 699, 711, 646 A.2d 365, 370 (1994).

*O'Brien v. O'Brien,* 367 Md. 547, 554, 790 A.2d 1, 5 (2002).

"In the context of multiple-claim or multiple-party litigation, or both, the purpose of the [final judgment] rules is to avoid

the costs, delays, frustrations, and unnecessary demands on judicial resources occasioned by piecemeal appeals." *Planning Board of Howard County v. Mortimer*, 310 Md. 639, 645–46, 530 A.2d 1237, 1240–41 (1987).

### Final Judgments in Garnishment Proceedings

Garnishments are intended to enforce judgments. *See Parkville Federal Savings Bank v. Maryland National Bank*, 343 Md. 412, 418, 681 A.2d 521, 524 (1996). "Garnishment is a remedy created and controlled by statute." *The Catholic University of America v. Bragunier Masonry Contractors, Inc.*, 139 Md.App. 277, 293, 775 A.2d 458, 467 (2001), *aff'd*, 368 Md. 608, 796 A.2d 744 (2002). It is a "statutory proceeding whereby a [judgment debtor's] money or property in possession of another are applied to payment of the former's debt to a third person." [20] *Chromacolour Labs, Inc. v. Snider Brothers Property Management, Inc.*, 66 Md.App. 320, 327–28 n. 4, 503 A.2d 1365, 1369 n. 4 (1986).

> "A garnishment proceeding is, in essence, an action by the judgment debtor for the benefit of the judgment creditor which is brought against a third party, the garnishee, who holds the assets of the judgment debtor. An attaching judgment creditor is subrogated to the rights of the judgment debtor and can recover only by the same right and to the same extent that the judgment debtor might recover."

*Bragunier Masonry Contractors, Inc. v. The Catholic University of America*, 368 Md. 608, 622, 796 A.2d 744, 752 (2002) (quoting *Parkville Federal Savings Bank*, 343 Md. at 418, 681 A.2d at 524); *see Fico, Inc. v. Ghingher*, 287 Md. 150, 159, 411 A.2d 430, 436 (1980). *See also International Bedding Co. v. Terminal Warehouse Co.*, 146 Md. 479, 488, 126 A. 902, 905 (1924); *see generally Simpson v. Consolidated Construction Services, Inc.*, 143 Md.App. 606, 795 A.2d 754 (2002).

---

**20.** As was stated by a Pennsylvania appellate court, "garnishment is a well-settled, viable remedy available to a judgment creditor to collect on a judgment from the judgment debtor's insurer." *Butterfield v. Giuntoli*, 448 Pa.Super. 1, 12, 670 A.2d 646, 651 (1995), *appeal denied sub nom. Butterfield v. Mikuta*, 546 Pa. 635, 683 A.2d 875 (1996).

■ These appeals present two issues that involve the nature of garnishment litigation: (1) whether, and to what extent, a garnishment constitutes a proceeding that is separate from the "underlying action" that created the judgment (even though a garnishment proceeding is "filed in the same action"); and (2) whether the attempts to collect property or credits of the judgment debtor that are in the hands of different garnishees constitute separate and distinct garnishment proceedings.

■ A garnishment of a judgment debtor's property has "many of the attributes of a separate cause of action," and a garnishee may respond to the writ "in a similar manner to a defendant pleading in an ordinary action." C. BROWN, INTRODUCTION TO MARYLAND CIVIL LITIGATION, § 6.34, 200–201 (1982). Thus, on the question of whether garnishment proceedings against separate insurers fall squarely within the confines of the underlying action, or are *sui generis*, garnishment has a separate character in those cases where the purported garnishee contests the process.

Under Maryland Rule 2–645(g), when a judgment creditor replies to a garnishee's answer to the writ, "the matter shall proceed as if it were an original action between the judgment creditor as plaintiff and the garnishee as defendant and shall be governed by the rules applicable to civil actions." Maryland Rule 2–645(e) expressly provides that the "garnishee may assert any defense that the garnishee may have to the garnishment, as well as any defense that the judgment debtor could assert." According to the Honorable Paul V. Neimeyer, "[t]he date of the filing of a reply under this rule is analogous to the date that a complaint is filed." *Commentary on the New Maryland Rules of Civil Procedure*, 43 MD.L.REV. 669, 857 (1984). *See also* PAUL V. NEIMEYER AND LINDA M. SCHUETT, MARYLAND RULES COMMENTARY at 521 (1992).

The Court of Appeals Standing Committee on Rules of Practice and Procedure has discussed the nature of property garnishment proceedings in cases in which the issue had been joined by the judgment creditor's reply, in contrast to those

routine situations where attachment and garnishment were virtually *pro forma*. *See Court of Appeals Standing Committee on the Rules of Practice and Procedure,* Minutes, March 12 and 13, 1982, at 37–39, noting:

> Several of the members expressed concern about the requirements of opening a new case. [Judge] Niemeyer pointed out that a new case involves additional process not required by the current garnishment practice. . . .
>
> The Reporter commented that the requirement of a new suit affords protection for the garnishee; election of jury trial, discovery, and all other procedural safeguards would be available. Mr. Smith noted that in some counties it is current practice to docket the garnishment proceeding as a new case against the garnishee. Mr. Bowen suggested that the full panoply of process associated with a new case will only be involved where the garnishee had money of the debtor but refuses to disgorge it. . . .
>
> . . . It was proposed that current practice be preserved to govern the 95% untroublesome garnishments and the type of procedure presented in this draft be reserved to govern the 5% contested cases. . . . Mr. Bowen maintained that . . . where the creditor contests the response filed by the garnishee that the problem cases are distinguished from the majority of garnishments. . . .

The next month, the following explanatory note was placed in the Committee minutes:

> [The proposed garnishment rule] has been redrafted with the intent of retaining the essence of current garnishment practice for use in the majority of cases and of making special provision for the few cases where controversy between the judgment creditor and garnishee requires the full panoply of a litigation action.[21]

Minutes, April 16, 1982, at 21.

 We hold that summary judgments in favor of some, but not all, of the garnishees constitute appealable final judg-

---

21. In their treatise on Maryland Civil Procedure, Professors Lynch and Bourne observe that "[t]here has been a right to trial by jury in

ments because each garnishment initiated against a different insurer constitutes a separate and distinct proceeding. Thus, a summary judgment that terminates the proceeding against a specific garnishee constitutes a final appealable judgment as to that garnishee.[22]

In light of our conclusion that garnishment proceedings are separate cases, even though filed in the underlying action, we shall deny the motions to dismiss the City's appeals from the entry of summary judgment in favor of Zurich Insurance Company and American Guarantee Insurance Company, and shall review the following rulings of the circuit court:

1. The circuit court's entry of summary judgment on Federal Insurance Company's Motion for Summary Judgment on the issue of exhaustion;

2. The circuit court's entry of summary judgment on Zurich Insurance Company's and American Guarantee's motions for summary judgment based on the product's hazard exclusion; and

3. The circuit court's entry of summary judgment on St. Paul Fire and Marine Insurance Company's (joined by Zurich) motions for summary judgment relating to trigger of coverage.

The City has also appealed the circuit court's May 16, 2000 decision to vacate its January 21, 2000 denial of the Motion to Set Aside the Consent Judgment filed by Zurich Insurance Company and American Guarantee. Judge Strausberg had originally denied that motion, effectively treating it as a request for summary judgment that required further

---

Maryland in garnishment actions." JOHN A. LYNCH, JR., AND RICHARD W. BOURNE, MODERN MARYLAND CIVIL PROCEDURE § 13.6 at 957 (1993).

**22.** The City points out that none of the garnishment cases has been consolidated by the circuit court. A consolidation of these cases would not have been fatal to the City's argument. *Cf. Coppage v. Resolute Insurance Co.*, 264 Md. 261, 263, 285 A.2d 626, 628 (1972)(separate and distinct cases consolidated for sake of convenience; appeal permitted); *accord Yarema v. Exxon Corp.*, 305 Md. 219, 240, 503 A.2d 239, 249–50 (1986).

development of the facts. On May 16, 2000, however, Judge Strausberg revisited this issue and ruled that his earlier consideration of this question had been premature.

It is true that the City would have a right to an immediate appeal from an order vacating an enrolled judgment. *Ventresca et ux. v. Weaver Brothers, Inc.,* 266 Md. 398, 403, 292 A.2d 656, 659 (1972). In this case, however, the City has appealed a decision to decide a motion to vacate. A party has no right to appeal a circuit court's ruling that it will-at some point in the future-decide whether there is merit in a motion to vacate a judgment. The parties have expended a considerable amount of effort and argument on this issue, but the decision to reconsider an earlier denial of a motion to vacate judgment is simply not an appealable order.[23] At this juncture, the consent judgment, which the City seeks to maintain, remains in effect. We therefore dismiss the City's appeal of the decision to consider Zurich's "Motion to Revise or Set Aside Consent Judgment—Collusion." [24]

### Collateral Order

The City contends that the order striking a jury trial falls under the "collateral order" doctrine, which provides for appellate review of a "narrow class of interlocutory orders [that are] treated as final judgments without regard to the

**23.** In *Pickett v. Noba,* 122 Md.App. 566, 572–73, 714 A.2d 212, 215, *cert. denied* 351 Md. 663, 719 A.2d 1262 (1998), this Court held that the denial of a motion to revise is a final, appealable order, but the denial of a second such motion is not, and would not be granted in any event. *Id. See People's Counsel v. Advance Mobilehome Corp.,* 75 Md.App. 39, 45–48, 540 A.2d 151, 154–55, *cert. denied,* 313 Md. 30, 542 A.2d 857 (1988).

**24.** In light of this disposition, we likewise deny as moot appellant's "Motion to Strike ... as to Issue Number One," as well as "Appellees' Motion to Include Excerpts of Ford Loker's Deposition Transcript in the Appellate Record." The City will have the opportunity to argue in the circuit court that a garnishee cannot "attack the validity of the judgment on which the attachment issues." *Gorn v. Kolker,* 213 Md. 551, 553, 133 A.2d 65, 67 (1957). While the insurers may not maintain a collateral challenge to the consent judgment, they may raise that defense in the garnishment proceeding itself.

posture of the case." *In re: Franklin P.*, 366 Md. 306, 326, 783 A.2d 673, 685 (2001); *Harris v. Harris*, 310 Md. 310, 315, 529 A.2d 356, 358–59 (1987); *Baltimore Police Dept. v. Cherkes*, 140 Md.App. 282, 298, 780 A.2d 410, 419 (2001). It is well settled that, to fall within the [final judgment] exception, the order appealed from must meet four requirements:

> (1) it must conclusively determine the disputed question; (2) it must resolve an important issue; (3) it must be completely separate from the merits of the action; and (4) it must be effectively unreviewable on appeal from a final judgment.

*In re: Franklin P.*, 366 Md. at 327, 783 A.2d at 685; *Ashcraft & Gerel v. Shaw*, 126 Md.App. 325, 341, 728 A.2d 798, 806 (1999). The first three elements are satisfied in this case. The denial of the jury trial "conclusively determined the disputed question," and clearly resolved an important issue that was separate from the merits. We are persuaded, however, that in this case the denial of a jury trial will be reviewable on appeal from a final judgment.

In *Old Cedar Development Corp. v. Jack Parker Construction Corp.*, 320 Md. 626, 579 A.2d 275 (1990), the Court of Appeals dismissed an appeal from an order striking a jury trial, rejecting the contention that the order to strike was a "final" order under section CJ 12–301. The Court held that the order striking the jury trial in that case was not "effectively unreviewable on appeal from a final judgment." 320 Md. at 632–33, 579 A.2d at 278–79. While the *Old Cedar* Court did note that, "[u]nder entirely different circumstances [an] order denying a jury trial might well satisfy the requirements of the collateral order doctrine," *Id. at* 633 n. 1, 579 A.2d at 279 n. 1 (citing *Kawamura v. State*, 299 Md. 276, 473 A.2d 438 (1984)),[25] we shall hold that the denial of a jury trial in this

---

**25.** In *Kawamura v. State,* 299 Md. 276, 473 A.2d 438 (1984), the Court observed that a District Court ruling denying a jury trial "might well have been appealable under the collateral order doctrine ... [because] if not appealable until the conclusion of the District Court trial, Kawamura's claim that he is entitled to a jury trial in the first instance ... would effectively be lost." *Id.* at 282 n. 5, 473 A.2d at 442 n. 5. The

instance does not constitute a collateral order because the circuit court's action is not "effectively unreviewable on appeal[.]" We shall therefore dismiss the City's appeals on this issue.

### Utica Mutual's Cross Appeals

██ Utica Mutual Insurance Company has filed two cross-appeals from the denials of two summary judgment motions. The denial of a motion for summary judgment is normally not a final judgment from which an appeal may be taken. *Porter Hayden Company v. Commercial Union Insurance Co.*, 339 Md. 150, 164, 661 A.2d 691, 698 (1995). A refusal to enter summary judgment does not "finally dispose" of any matter, but instead allows the case to proceed. *See Ralkey v. Minnesota Mining and Mfg. Co.*, 63 Md.App. 515, 523, 492 A.2d 1358, 1362 (1985).

It is true that in limited circumstances, a refusal to enter summary judgment may constitute an appealable collateral order.[26] That exception does not apply here because the denials at hand lack "the characteristic of finality." *Porter Hayden*, 339 Md. at 164, 661 A.2d at 698. We shall dismiss

---

concern in a case such as *Kawamura* is that a defendant's right to a jury trial in that criminal case would already have been abridged by the time he obtains a retrial after appeal. *Cf. Mandel v. O'Hara*, 320 Md. 103, 134, 576 A.2d 766, 781 (1990)(absolute immunity carries with it right to avoid trial as party defendant; review after final judgment will not protect right; appeal will lie from denial of former governor's motion for summary judgment as collateral order).

**26.** In *Mandel, supra,* 320 Md. 103, 576 A.2d 766, the Court of Appeals confronted a question of absolute gubernatorial immunity from damages for non-constitutional torts based on a veto of legislative enactments. A lawsuit was filed against Governor Mandel seeking damages arising in connection with the exercise of his approval/veto function. The circuit court denied the Governor's motion for summary judgment that had been interposed on absolute immunity grounds. The Court of Appeals reversed the denial, explaining that "absolute immunity" protected the Governor from the ordeal of trial itself, and an appeal from a final judgment would not vindicate that right. *Id.* at 134, 576 A.2d at 781. This case does not present circumstances similar to those found in *Mandel,* where a privilege would have been inexorably lost had that trial been permitted to go forward.

Utica's cross-appeals from the denials of its summary judgment motions.[27]

## Motion to Strike Affirmative Defenses

The City filed a cross-motion to strike four affirmative defenses that had been raised by the Insurers. That motion was summarily denied by the circuit court.[28] The circuit court's refusal to strike the insurers' affirmative defenses is not a final, appealable order. Even if the garnishees cannot overturn the consent judgment in the underlying action, they are not precluded from disputing the amount of that judgment in the garnishment proceeding.[29] We shall there-

---

27. The Insurance Environmental Litigation Association (IELA), as *Amicus Curiae*, addresses two issues, *viz.* the standard of proof that must be met for a policyholder to prove the nature and extent of coverage where the policy has been lost, and the question of allocation of liability among multiple insurers. The former issue is rendered moot in view of our dismissal of Utica's cross-appeal on that issue. In light of our disposition of Utica's cross-appeals, we shall also deny the City's Motion to include certificates of insurance issued by Utica Mutual as well as similar documents related to coverage provided by U.S. Fire, which has settled.

28. The City's opening brief asserts that these defenses are, effectively, direct challenges to the underlying Consent Judgment that should have been raised in the Insurers' motion to set aside the consent judgment.

29. In *Renschler v. Pizano*, 329 Pa. 249, 198 A. 33 (1938), the garnishee was an insurance company that initially refused to defend its policyholder in a personal injury suit arising out of a motor accident. The judgment plaintiff obtained a verdict against the insured defendant. The parties to the underlying action settled under suspicious circumstances that changed the nature of the action so that the injuries would be covered by insurance. The plaintiff issued an attachment. The garnishee insurance company, which was aware of the suit and declined to defend, alleged fraud in the settlement of the underlying action, and appealed an Order of the Court of Common Pleas denying its application to reopen the judgment. On appeal, the Supreme Court of Pennsylvania upheld the lower court's refusal to reopen the judgment, as well as the trial court's holding that the garnishee had an adequate defense in the attachment proceeding. Although the discussion centers on the fact that an insurer without notice may contest a judgment such as this, the Pennsylvania Court emphasized that "the defense of fraud is always available to the indemnitor[.]" *Id.*, 329 Pa. at 254–55, 198 A. at 36.

fore dismiss the City's appeal from the denial of its motion to strike.

## Coverage Issues

The appeals from summary judgment[30] entered in the garnishment proceedings involve the issue of whether the City's damages were excluded from coverage by "Products Hazard Exclusion" clauses in Comprehensive General Liability policies, as well as coverage of issues of "trigger," "allocation" and "known loss."

## Products Hazard Exclusion

The City argues that summary judgment should not have been entered in favor of Zurich and American Guarantee (the "Products Hazard Motion") on the ground that property damage is excluded by the terms of the CGL primary and umbrella policies issued to Croker by Zurich Insurance Company and American Guarantee and Liability Insurance Company.

## The Policies at Issue

Croker purchased third-party Comprehensive General Lia-

---

In *Independent School District No. 197 v. Accident & Casualty Insurance of Winterthur*, 525 N.W.2d 600 (Minn.Ct.App.1995), *review denied* (Minn. Apr. 27, 1995), the Minnesota Court of Appeals stated:

When an insurer has denied that its policy affords any coverage ... the insured may agree to have judgment entered against it on condition the judgment is collectible from available insurance. Such a judgment is binding on the insurer if (1) the judgment was obtained without fraud or collusion; and (2) the settlement on which the judgment is based was reasonable and prudent.

525 N.W.2d at 606–07 (citations omitted). The settlement must be effected in good faith. *See Continental Casualty Co. v. Westerfield*, 961 F.Supp. 1502, 1504–06 (D.N.M.), *aff'd sub nom. Continental Casualty Co. v. Hempel*, 108 F.3d 274 (10th Cir.1997) & 4 Fed.Appx. 703 (10th Cir.2001); *Amalgamet Inc. v. Underwriters at Lloyds*, 724 F.Supp. 1132, 1141 (S.D.N.Y.1989).

**30.** Summary judgment is appropriate where there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Md. Rule 2–501(a). Our review of the circuit court's entry of summary judgment is plenary. *See Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001).

bility (CGL) insurance policies from a number of carriers.[31] American Guarantee and Liability Insurance Company issued policy TOP 74–74–079, a general liability policy to Croker for the period September 5, 1979 through September 5, 1980. The record also shows that an umbrella policy, No. 89–28–612, was issued to Croker by Zurich for the period of September 5, 1980 through September 5, 1981.[32] There also appears a "schedule of forms and endorsements" for a Policy No. 89–28–

---

**31.** Comprehensive general liability insurance ordinarily provides "coverage for third party casualty claims against a purchaser of insurance (the 'insured')." *Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 770 n. 1, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *see generally Gelman Sciences, Inc. v. Fidelity & Casualty Co.*, 456 Mich. 305, 312, 572 N.W.2d 617, 620 (1998); *cf. Bausch & Lomb Inc. v. Utica Mutual Ins. Co.*, 355 Md. 566, 582, 735 A.2d 1081, 1090 (1999) (CGL policy primarily for third party claims; not at all unusual for a liability policy also to provide some first party coverage in certain instances). The "first standard provisions CGL [comprehensive general liability] policy came into being in 1940." George H. Tinker, *Comprehensive General Liability Insurance–Perspective and Overview*, 25 Fed. Inc. Coun. Q. 217, 220 (1975). *See* Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations–What Every Lawyer Should Know*, 50 Neb. L.Rev. 415, 418–419 (1970). As stated by George H. Tinker,

> [t]he CGL is "general" only in contradistinction to "automobile." It is "comprehensive" only in the sense that it combines certain historic forms of coverage into an integrated whole, with coverage being broadly stated in a single insuring agreement and exclusions circumscribing the limitations of the broad grant. The CGL is not, and was never conceived to be, an 'all-risk' liability policy.

25 Fed. Ins. Coun. Q. at 220. Until 1973, the standard provisions of the CGL policies had been revised on four occasions—1943, 1955, 1966, 1973. *See Weedo v. Stone–E–Brick, Inc.*, 81 N.J. 233, 237 n. 1, 405 A.2d 788, 790 n. 1 (1979) (citing Tinker). In 1977, the Insurance Services Office, Inc. (ISO), an association of domestic property and casualty insurers, initiated revisions in the standard CGL form. *Hartford Fire*, 509 U.S. at 773, 113 S.Ct. 2891. As a result, the CGL was changed in 1984, with ISO offering both "occurrence" and "claims-made" versions and recently in 1986. After some controversy within the membership of the ISO, these forms were withdrawn and in 1986 a "claims-made" CGL was offered. *Id. See also*, James F. Hogg, *The Tale of a Tail*, 24 Wм. Mitchell L.Rev 515, 516 (1998). We are concerned in this case with variants of the 1973 CGL form.

**32.** American Guarantee also issued a primary policy for the period from September 5, 1980 through September 5, 1981. Croker purchased from Zurich an umbrella policy for September 5, 1979 through September 5, 1980.

611 issued by Zurich, effective September 1, 1980. Endorsement No. 38 excludes from coverage "The Products Hazard [and] the Completed Operations Hazard."

Section II of the American Guarantee Policy, entitled "Comprehensive General Liability Coverage with Optimal Extended Protection," [33] provides the following coverage:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence[.]

Policy No. TOP 74 74 079, Section II. The policy includes the following definitions:

> "**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;
>
> "**products hazard**" includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;
>
> "**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period[.]

Policy No. TOP 74 74 079, "Definitions—Section II."

The Zurich Insurance Company umbrella policy, No. 89–28–612, provided coverage from September 5, 1980, to September 5, 1981. Under this policy, Zurich agreed to "indemnify the

---

**33.** "Section I" of the TOP 74 74 079 Policy provides "General Property Coverage with Optional Extended Protection."

insured for ultimate net loss in excess of the retained limit hereinafter stated which the insured shall become legally obligated to pay as damages because of ... B. property damage ... to which this policy applies, caused by an occurrence."

These policies, in one form or another, purport to limit the carriers' obligations to indemnify the insured by means of various exclusions.[31] The "purpose of the products hazard exclusion is to exempt products liability claims made against the insured from liability coverage." *Brewer v. The Home Insurance Company,* 147 Ariz. 427, 429, 710 P.2d 1082, 1084 (App.1985). The American Guarantee primary policy includes a "Products and Completed Operations Coverage" exclusion, which removes from coverage "bodily injury or property damage included within the Completed Operations Hazard or the Products Hazard," as defined in the primary policy. The policy contains a Products and Completed Operations Hazards Exclusion that provides:

A. Products and Completed Operations Hazards Exclusion: to bodily injury or property damage included within the Completed Operations Hazard or the Products Hazard.

The policy then refers, *inter alia,* to the applicable definitions of "products hazard" and "property damage."

The Zurich umbrella policy also removes from coverage:

property damage to (1) property owned by the insured, or (2) the insured's products arising out of such products or any part of such products, or (3) work performed by or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith, or (4) property rented to, occupied or

---

**34.** As noted by the Supreme Court of Idaho, "what one giveth, one can taketh away," *Chancler v. American Hardware Mutual Insurance Co.,* 109 Idaho 841, 843, 712 P.2d 542, 544 (1985). As noted by the Michigan Court of Appeals, "[a]n insurer is free to define or limit the scope of coverage as long as the policy language fairly leads to only one reasonable interpretation and is not in contravention of public policy." *Marlo Beauty Supply, Inc. v. Farmers Insurance Group of Companies,* 227 Mich.App. 309, 317, 575 N.W.2d 324, 328 (1998), *appeal denied,* 459 Mich. 954, 616 N.W.2d 170 (1999).

used by or in the care, custody or control of the insured to the extent the insured is under contract to provide insurance therefor[.]

Zurich Umbrella Policy No. 89–28–612 "II Exclusions." The Zurich policy defines "occurrence" to mean:

with respect to subsection (1) of the definition of personal injury and with respect to property damage, an accident or happening or event or injurious exposure to conditions, which results, during this policy period, in such personal injury or property damage neither expected nor intended from the standpoint of the insured. All ultimate net loss arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence.

Zurich Umbrella Policy No. 89–28–612 "VII Definitions" (No.) 7 "Occurrence." "Products hazard" includes:

personal injury and property damage arising out of the insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the insured and after physical possession of such products has been relinquished to others[.]

Zurich Umbrella Policy No. 89–28–612 "VII Definitions" (No.) 9 "Products Hazard." "Property Damage" is defined as "injury 'to or destruction of property.' " *Id.,* No. 10.

### Negligent Failure to Warn

In its amended complaint, the City asserted a negligence action based on Croker's alleged failure to warn of the hazards presented by asbestos. It argues to us that a negligent failure to warn claim is not excluded under the Product Hazards Exclusion, and thus the CGL policies extended coverage to the claims it has asserted. According to the City, because the failure to warn allegation sounds in negligence, it is outside of the Products Hazard Exclusion.[35]

---

**35.** The City also argues that two of the policies in question, the primary policy issued by American Guarantee for 1980–81 and the umbrella

Judge Strausberg entered summary judgment for the Insurers on this issue, ruling that a failure to warn of the inherent dangers of asbestos was a factor so closely related to the product that this claim too was excluded from coverage. This ruling expressly relied upon *Celotex Corp. v. AIU Insurance Company (In re Celotex Corp.)*, 149 B.R. 997 (Bankr. M.D.Fla.1993), in which the Bankruptcy Court held that the products hazard exclusion in the liability policies in question deleted from coverage the insured's negligent failure to warn of the inherently dangerous properties of asbestos.

 An injured party may assert a claim for failure to warn of the latent defects of a product under theories of strict liability, negligence, and warranty.

> Maryland has long recognized a duty on the part of sellers to warn of latent dangers attendant upon a proper use of the products they sell, where injury is foreseeable. The standard applied in that regard, under all three theories of negligence, breach of implied warranty, and strict liability, has been that stated in *Restatement (Second) of Torts* § 388.

*Dechello v. Johnson Enterprises,* 74 Md.App. 228, 236, 536 A.2d 1203, 1207, *cert. denied sub nom. Albert E. Pecora Importers v. DeChello,* 312 Md. 601, 541 A.2d 964 (1988). "A product may become defective because of a failure to give an adequate warning." *ACandS, Inc. v. Abate,* 121 Md.App. 590, 702, 710 A.2d 944, 999, *cert. denied sub nom. Crane v. Abate,* 350 Md. 487, 713 A.2d 979 (1998), *cert. denied sub nom. John Crane, Inc. v. Abate,* 525 U.S. 1171, 119 S.Ct. 1096, 143 L.Ed.2d 95 (1999). In *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992), the Court of Appeals noted that in strict liability failure to warn cases, "negligence concepts to some extent have been grafted onto strict liability." *Id.* at 435, 601 A.2d at 640; *cf. Phipps v. General Motors Corp.,* 278

---

policy issued by Zurich for 1979–80, are not in evidence, and thus the entry of summary judgment on these policies was in error.

Md. 337, 351, 363 A.2d 955, 963 (1976)(theory of strict liability not radical departure from traditional tort concepts).

The defense of contributory negligence may be asserted in "failure to warn" negligence actions but that defense may not be asserted in strict liability actions. *See Zenobia,* 325 Md. at 435 n. 7, 601 A.2d at 640 n. 7; *see also Russell v. G.A.F. Corp.,* 422 A.2d 989, 991 n. * (D.C.App.1980). Nevertheless, these two theories—negligence and strict liability failure to warn—have been described as nearly identical. In either instance the failure to warn causes the product to be defective with respect to its "latent dangerous characteristics." In either instance, the duty to provide adequate warnings in essence "runs with the product," and remains with the seller subsequent to the sale. Thus, the Court of Appeals has concluded that "a manufacturer of a defective product has a duty to warn of product defects which the manufacturer discovers after the time of sale." *Zenobia,* 325 Md. at 446, 601 A.2d at 645.

The Court of Appeals has also stated that the continuing duty to warn is applicable to suits for property damage. *See United States Gypsum,* 336 Md. at 160, 647 A.2d at 412. An installer such as Croker, who "should have known" about the danger of the ACBMs, has a duty to provide adequate warnings about that product. *Eagle–Picher Industries, Inc. v. Balbos,* 326 Md. 179, 198–200, 203–04, 604 A.2d 445, 455–57 (1992). The supplier-installer is held to the same standard of awareness of the dangerous characteristics of asbestos, *viz.* "should have known," whether the cause of action is denominated "strict liability" or sounds in negligence. *See id.* at 199–200, 604 A.2d at 455; *Zenobia,* 325 Md. at 443 n. 11, 601 A.2d at 644 n. 11.

Judge Strausberg relied on the Bankruptcy Court's decision in *Celotex* because it, too, involved the nature and extent of insurance coverage in an asbestos-related property damage case. There is, however, a split of authority on this issue.

In *Scarborough v. Northern Assurance Co.,* 718 F.2d 130 (5th Cir.1983), the insured, a supplier of sand, filed a third-

party claim against two insurers, asserting a right to reimbursement for costs it had incurred in successfully defending a products liability action. The district court dismissed the claim, ruling that the insurers' policies excluded coverage of claims arising out of the company's silica products. The company appealed to the United States Court of Appeals for the Fifth Circuit, which framed the issue as:

> whether [the] complaint [in the underlying action], which alleged, among other things, that [the company] had furnished [plaintiff's] employers sandblasting material (sand) "without proper instructions for its use," alleged a ground of liability against [the company] that was not excluded by the exclusion provisions of [insurers'] policies.

*Scarborough*, 718 F.2d at 132. Applying Louisiana law, the *Scarborough* Court held that a negligent failure to warn was not excluded by the "products hazard" exclusion.[36]

In *Harford Mutual Ins. Co. v. Moorhead*, 396 Pa.Super. 234, 578 A.2d 492 (1990), the Pennsylvania Superior Court concluded that a products hazard exclusion did not apply to allegations of negligent failure to warn. In that case, manufacturers of wine making supplies marketed a sulphur strip that was designed to prepare a vessel for use in the fermentation of grapes. The strip would be ignited and placed inside the fermentation container in order to kill bacteria. The customer placed the strip inside a former whiskey barrel, which exploded because of the presence of alcohol vapors. Litigation followed, with plaintiffs asserting, *inter alia*, that

---

**36.** Construing the complaint liberally, the Fifth Circuit ruled that an assertion that a defendant had failed to provide "proper instructions" sounded in negligence. The court then looked to decisions by the Louisiana Court of Appeals in *Cooling v. United States Fidelity & Guaranty Co.*, 269 So.2d 294 (La.App. 3d Cir.1972), writ ref'd, 272 So.2d 373 (La.1973); *Templet v. Goodyear Tire and Rubber Company, Inc.*, 341 So.2d 1248 (La.App. 1st Cir.), *writ denied*, 343 So.2d 1077 (La.1977), and *Ada Resources, Inc. v. Don Chamblin & Associates, Inc.*, 361 So.2d 1339 (La.App. 3d Cir.1978). These decisions persuaded the court that, under Louisiana law, the insurers could not escape their obligation to indemnify on the basis of the products hazard exclusion. 718 F.2d at 137.

the defendants were negligent in failing to warn of the dangers posed by lighting the strip.

In a declaratory action initiated by the defendants' insurer, the trial court entered judgment in favor of the insured. The insurer appealed, contending that the "essence" of the underlying complaint was one of products liability, and not negligence, regardless of how drafted. The wine makers responded that the exclusion was inapplicable in this case. The Pennsylvania Superior Court agreed with that argument,[37] explaining:

> Alleged negligence which does not involve the sale of a defective product is of a type which "occurs occasionally in the course of business and is a risk for which businesses buy general coverage." ... To construe a "Products Hazard" exclusion to apply in a suit later brought against an insured where the product sold was not the *cause of the damage,* but was merely an *incidental instrumentality* through which the damage was done, would defeat the purpose of purchasing such a policy by rendering meaningless much of the stated coverage.... Thus, we conclude, as did this Court in *Friestad [v. Travelers Indemnity Co.,* 260 Pa.Super. 178, 393 A.2d 1212 (1978) ], that the "Products Hazard" exclusion applies only when a *product,* rather than a *service,* is the alleged cause in fact of damages or injury to a third person.

*Moorhead,* 396 Pa.Super. at 242, 578 A.2d at 496 (emphasis supplied, citations omitted). Following *Moorhead,*[38] the United States District Court for the Western District of Pennsyl-

---

**37.** *See also Keystone Spray Equipment, Inc. v. Regis Insurance Company,* 2001 Pa.Super. 13 ¶ 7, 767 A.2d 572, 574 (2001); *Pennsylvania National Mutual Casualty Insurance Company v. Kaminski Lumber Company, Inc.,* 397 Pa.Super. 484, 488, 580 A.2d 401, 403 (1990).

**38.** The *Moorhead* Court also stated that,

[r]egardless of motivation or analytical justification, the fact remains that Pennsylvania courts consistently analyze the negligence/failure to warn and strict liability/failure to warn causes of action separately, treating conduct-related counts apart from product-related counts. *Moorhead,* 396 Pa.Super. at 250–51, 578 A.2d at 501.

vania concluded that the Pennsylvania Superior Court's opinion "stands for the proposition that an insurer must accept a claim as stated in the complaint and cannot justify its decision to deny coverage by attempting to recharacterize the claim to fit within the terms of the exclusion." *Devich v. Commercial Union Ins.,* 867 F.Supp. 1230, 1235 (W.D.Pa.1994).

In *Chancler v. American Hardware Mutual Insurance Co.,* 109 Idaho 841, 712 P.2d 542 (1985), the Supreme Court of Idaho reached the same result. The plaintiff in an underlying tort action was injured when a crane he had been operating collapsed. In a declaratory judgment action against the seller's insurance company, the trial court and Idaho's intermediate appellate court agreed that the products hazard exclusion was applicable. The Idaho Supreme Court reversed, concluding that the exclusion did not apply. *Chancler,* 109 Idaho at 847, 712 P.2d at 548; *cf. Marlo Beauty Supply,* 227 Mich. App. at 319–20, 575 N.W.2d at 329 (exclusion does not explicitly disavow coverage for damages resulting from failure to warn).

In *Celotex,* the debtor-manufacturer sought a declaration regarding the scope of the "products hazard" exclusion in its liability policies, and asked the court to determine whether the definition of "products liability" or "products hazard" covered liability for asbestos-related property damage. The debtor company's argument tracks the argument presented by the City in the case at bar:

> Debtor asserts a distinction must be made between those claims founded in strict liability, which requires a showing of a defective product, and those claims alleging mere negligent failure to warn, which does not require a showing of a defect in the product involved in the injury.... Thus, Debtor argues the claims are not directly related to products liability.

149 B.R. at 999–1000. The Bankruptcy Court agreed with the insurance company, and rejected the debtor's argument that its negligent failure to warn was "sufficiently removed from the nature of its asbestos-containing products to warrant

classification as something other than products liability." *Id.* at 1001. The court noted *Scarborough* and *Moorhead,* but disagreed with those cases, explaining:

> In this case, however, the Court finds the alleged damages resulting from the failure to warn of the dangers involved in the use of the asbestos-containing products are sufficiently tied to the nature of Debtor's products to warrant denominating the liability as products hazard.... The underlying complaints allege asbestos is a dangerous, defective product whether used properly or improperly. Any liability based upon negligent failure to warn of those innate dangers is directly associated with the product.

149 B.R. at 1001. The court stated that, in the case of inherently dangerous products, "it is the failure to warn of those inherent dangers that makes the product defective and implicates the products hazard or products liability provisions of the policies." 149 B.R. at 1002.

Other courts also agree with *Celotex.* As was explained by a Florida intermediate appellate court:

> The complaint against appellants did not allege that they sold the wrong product; or that they had a duty to warn of possible results of misuse [thereof]; or that [defendant] negligently failed to advise [plaintiffs] of additional available equipment which would safely adapt the [product] for a particular use. On the contrary, it alleged that [defendant] was on notice of a dangerous condition created by a product defect and did not warn of it. Thus, even though the complaint does contain an allegation of negligent failure to warn, it effectively alleges a bodily injury arising out of either the named insured's product or reliance upon a necessarily implied warranty with respect to its fitness. The negligence alleged is clearly that contemplated by the exclusions.

*K–C Manufacturing Co., Inc. v. Shelby Mutual Insurance Co.,* 434 So.2d 1004, 1006–07 (Fla. 1st DCA 1983). *See also Brewer,* 147 Ariz. at 431, 710 P.2d at 1086 (negligent instructions pertaining to product installation and failure to warn of

related danger fall within exclusion); *accord, Laminated Wood Products, Co. v. Pedersen,* 76 Or.App. 662, 671, 711 P.2d 165, 170 (1985), *review denied,* 300 Or. 722, 717 P.2d 630 (1986) (claim that insured failed to warn of unreasonably dangerous condition and negligently designed, manufactured and supplied product, alleged damage "arising out of named insured's products"). *See also Laidlaw Environmental Services (TOC) Inc. v. AETNA Casualty & Surety Company of Illinois,* 338 S.C. 43, 50–51, 524 S.E.2d 847, 851 (Ct.App.1999); *Massachusetts Insurance Insolvency Fund v. Eastern Refractories Co., Inc.,* Civil Action No. 89–4811 [1997 Mass.Super. LEXIS 589] (Suffolk Super. Ct. July 10, 1997) (Rouse, J.); *cf. Flint v. Universal Machine Company,* 238 Conn. 637, 649–50, 679 A.2d 929, 935–36 (1996) (failure to warn allegation relates to and is part of defective workmanship claims).

In *Fibreboard Corp. v. Hartford Accident and Indemnity Co.,* 16 Cal.App.4th 492, 20 Cal.Rptr.2d 376 (1993), the plaintiffs in asbestos-in-buildings cases sought damages based on a variety of theories, including negligence and strict liability. In this particular appeal, Fibreboard, a manufacturer of asbestos-containing products, asked the California Court of Appeals to overturn a trial court's entry of summary judgment in favor of the insurer on the ground that numerous claims were excluded under an asbestos products exclusion.

Fibreboard argued to the appellate court that "claims based on theories such as concert of action [and] failure to disclose hazardous nature of products ... have 'nothing to do with any product manufactured, sold, handled or distributed by Fibreboard' " and accordingly would not be subject to an exclusion limiting indemnity for products claims. The Court of Appeals rejected that argument,[39] explaining:

---

**39.** The court distinguished *Scarborough* and *Cooling:*

[A]micus ... argues that any liability for failure to warn is outside the products hazard clause. The two cases which amicus curiae cites are inapposite or suspect. In the first, *Cooling* ... the court concluded that the product was not defective, and the alleged failure to warn of the need for including safety devices was in the nature of a general risk of doing business. Here, the asbestos products *are defective*

Within the framework of the Hartford policies and the continuum of coverage provided for liability stemming from operations and products, it is obvious that the traditional products claims in the underlying complaints, namely, those asserting negligent testing, design, manufacture and sale; strict liability for design and manufacturing defects; failure to warn; breach of warranties; misrepresentation. and the like, are within the four walls of the "products hazard" clause.

16 Cal.App.4th at 502, 20 Cal.Rptr.2d at 382.

It is true that there is a distinction between strict liability and negligence.[40] While they are not redundant causes of action, in the context of a defective product case, under either theory, it is the failure to warn that renders the product defective.[41] We therefore hold that the products hazard exclusion applies to claims for negligent failure to warn of the dangers of an inherently dangerous product such as asbestos in all of its forms.[42] Whether styled as "negligence" or "strict liability," a complaint for failure to warn of the dangers of the asbestos-containing materials in this case seeks to recover for property damage "arising out of the named insured's products." We shall therefore affirm the entry of summary judgment in favor of American Guarantee as to its policy No. TOP

---

precisely because of the absence of warning about their dangers. The second case (*Scarborough* ... ) applies Louisiana law and, accordingly, relies on *Cooling.*
*Fibreboard Corp. v. Hartford Accident and Indemnity Co.,* 16 Cal.App.4th 492, 505, 20 Cal.Rptr.2d 376, 384 (1993).

**40.** *See generally Anderson v. Owens–Corning Fiberglas Corp.,* 53 Cal.3d 987, 1003–04, 281 Cal.Rptr. 528, 538, 810 P.2d 549, 559 (1991).

**41.** The failure to warn "related to the product defect." *Viger v. Commercial Insurance Company of Newark,* 707 F.2d 769, 773 (3d Cir.1983).

**42.** *See Laminated Wood Products Co. v. Pedersen,* 76 Or.App. 662, 671, 711 P.2d 165, 170 (1985); *see also LaBatt Company v. Hartford Lloyd's Insurance Company,* 776 S.W.2d 795, 799–800 (Tex.App.-Corpus Christi 1989, no writ) (allegations of negligence do not convert products liability action into negligence suit where allegations charge defect in product).

74 74 079 for the period September 5, 1979 through September 5, 1980, on the basis of the products hazard exclusion. We shall also affirm the summary judgment in favor of American Guarantee for the policy in effect from September 5, 1980 through June 2, 1981, and affirm the summary judgment in favor of Zurich for the umbrella policy that had been written for September 5, 1979 to September 5, 1980.

### Own Products Exclusion

We vacate the summary judgment entered in favor of Zurich with respect to the annual period from September 5, 1980 to September 5, 1981. In applying the products hazard exclusion to relieve Zurich from any potential indemnification liability on its umbrella policy for that period, the circuit court cited what is generally referred to as the "own products exclusion." As noted by the Illinois Appellate Court, this exclusion by its terms does not apply to indemnification for damage inflicted on the property of persons other than the insured. *See United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill.App.3d 598, 633, 643 N.E.2d 1226, 1248–49, 205 Ill.Dec. 619 (1994), *appeal denied*, 161 Ill.2d 542, 208 Ill.Dec. 370, 649 N.E.2d 426 (1995).

Zurich may be entitled to a judgment in its favor, as exclusion of coverage for this period of time will be controlled by the products hazard exclusion that purportedly exists as an endorsement to the 1979–1980 umbrella policy. But the record demonstrates confusion on this point, for it contains, as stated above, a schedule of endorsements with a policy number that is different from that employed to identify the Zurich umbrella policy. Although it is argued that the endorsements actually refer to Zurich No. 89–28–612, instead of 89–28–611 as written, the record shows that the effective dates for the documents differ, as do the agency or producer numbers. There may be a logical explanation for these discrepancies, but the discrepancies must be resolved by the trier of fact.

### Trigger of Coverage

Utica Mutual, joined by St. Paul, Zurich and American Guarantee, filed a motion for summary judgment on the

ground that (1) the City could not prove the amount of property damage that occurred during its policy period, and (2) it would not be technologically feasible to demonstrate such damage. Utica also contended that, because the "total amount" of property damage occurred at the moment of installation, damages sought by the City were not covered by insurance policies that were on the risk only after the asbestos was installed.[43]

Utica's motions were denied, but summary judgment was entered in favor of St. Paul and Zurich. Citing this Court's decision in *Harford Mutual Insurance Co. v. Jacobson*, 73 Md.App. 670, 536 A.2d 120, *cert. denied*, 312 Md. 601, 541 A.2d 964 (1988), for the proposition that "no insurers can be liable after manifestation of property damage[,]" the circuit court concluded:

> Discovery or manifestation of damage occurs on the date when appreciable property damage was actually discovered or should have been discovered.... [L]iability will only extend to those insurers who provided coverage from the date of installation until the date that the City actually discovered or should have discovered, if acting reasonably, that the Croker installed, asbestos-containing thermal systems insulation was harmful.

The City argues that St. Paul and Zurich were not entitled to summary judgment on the ground that their policies covered periods subsequent to December 31, 1980.[44] The City also argues that *its* knowledge of the asbestos problem is irrelevant to the question of what Croker knew and what impact that knowledge has on Croker's right to indemnification from its carriers.

---

43. The latter three insurers additionally argued that they would not be liable to indemnify the insured on the basis of policies whose coverage periods commenced *after* the property damage became manifest.

44. St. Paul, Zurich, and American Guarantee joined in Utica's motion for summary judgment. Judgment was denied with respect to Utica, but granted in favor of St. Paul and Zurich, specifically. American Guarantee is not mentioned in the circuit court's order.

According to the City, the circuit court erred in applying a trigger of coverage rule that has been discredited in Maryland, when it should have applied the "injury-in-fact" trigger applied by the Court of Appeals in *Harford County v. Harford Mutual Insurance Co.*, 327 Md. 418, 610 A.2d 286 (1992). According to St. Paul Fire & Marine Company, Zurich Insurance Company, and American Guarantee and Liability Insurance Company, the circuit court correctly entered judgment in their favor because their policies took effect after the manifestation of the City's damages in this case, and this is a "trigger of coverage" question rather than a defense based on the concept of known loss.

■ We are persuaded that, while the "injury-in-fact" is an appropriate trigger of coverage rule for asbestos-in-building property damages, this trigger does not preclude coverage under subsequent policies when there is continued exposure.

■ "Trigger is a legal rule designed to determine when a policy must respond." James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: the Debate over the Appropriate Trigger Rule*, 45 DRAKE L.REV. 625, 652 (1997).

The policies do not refer to a "trigger"; "the term 'trigger' is merely a label for the event or events that under the terms of the insurance policy determines whether a policy must respond to a claim in a given set of circumstances."

*Owens–Illinois, Inc. v. United Insurance Co.*, 138 N.J. 437, 447–48, 650 A.2d 974, 979 (1994) (citing Robert D. Fram, *End Game: Trigger of Coverage in the Third Decade of CGL Latent Injury Litigation*, in 10th Annual Insurance, Excess, and Reinsurance Coverage Disputes 9 (PLI Litig. & Admin. Practice Course Handbook Series No. 454, [454 PLI/Lit 9] 1993)("Fram")).

Although the CGL policy is essentially a standard form, divergent theories have been applied to the trigger of coverage. In *Owens–Illinois*, the New Jersey Supreme Court reviewed a number of theories for the trigger of policy coverage, stating:

The most frequently offered theories for the trigger of coverage are (1) the exposure theory, (2) the manifestation theory, and (3) the continuous-trigger theory .... [and][a]t least two other less-frequently followed theories exist. One is the "injury-in-fact" (or "damages-in-fact") approach, which holds that coverage is triggered by a showing of actual injury or damage-producing event.... Under that theory, coverage is triggered by "a real but undiscovered injury, proved in retrospect to have existed at the relevant time * * * irrespective of the time the injury became manifest." ... [A]fter an injury ... it may be inferred ... that the harm actually began sometime earlier ... [and f]inally, the "double-trigger" theory holds that injury occurs at the time of exposure and the time of manifestation, but not necessarily during the intervening period.

*Id.,* 138 N.J. at 449–51, 650 A.2d at 980–81 (citations, footnotes and internal quotations omitted). *See also Village of Morrisville Water & Light Dept. v. United States Fidelity & Guaranty Co.,* 775 F.Supp. 718, 730–31 (D.Vt.1991).

The divergent views on the appropriate trigger of coverage can be explained by the fact that "third party CGL policies do not impose, as a condition of coverage, a requirement that the damages or injury be discovered at any particular point in time." *Montrose Chemical Corp. v. Admiral Insurance Company,* 10 Cal.4th 645, 664, 42 Cal.Rptr.2d 324, 913 P.2d 878, 887 (1995). As stated by one commentator:

Resolving the issue of when coverage is triggered is important because only a triggered policy potentially covers the injury.

Courts have concluded that exposure, latency, occurrence of the injury, or manifestation-and even combinations of these-will trigger coverage. Corresponding trigger theories followed: the exposure theory, the manifestation theory, the triple-trigger theory, and the injury-in-fact theory.

Lee H. Ogburn, *The Progression of Trigger Litigation in Maryland—Determining the Appropriate Trigger of Coverage, its Limitations and Ramifications,* 53 MD. LAW REV. 220,

222 (1994) ("Ogburn"). According to the Michigan Supreme Court, reference to specific trigger paradigms "can be deceiving," because in the final analysis the court must apply policy language in particular factual contexts. *See Gelman Sciences, Inc. v. Fidelity & Casualty Co.,* 456 Mich. 305, 317, 572 N.W.2d 617, 622 (1998); *Domtar, Inc. v. Niagara Fire Insurance Co.,* 563 N.W.2d 724, 733 (Minn.1997).

In *Harford County,* the Court of Appeals addressed the trigger of coverage question under a CGL policy in a case involving property damage resulting from environmental pollution. During the time period relevant to that litigation, the county operated five sanitary landfills. For a portion of that period, the county carried standard form CGL liability insurance to cover, *inter alia,* county liability for property damage claims arising out of the operation of the landfills. The county initially obtained "accident" policies, designed to respond to "accidents which occurred during the policy period." The CGL policy was revised in 1966 by the National Bureau of Casualty Underwriters, so the policies offered to the county covered property damage on an "occurrence" basis. *Harford County,* 327 Md. at 420–21 & n. 1, 610 A.2d at 287 & n. 1. The policies in question expired in 1982.

Upon discovering that seepage from the landfills contaminated underlying groundwater, the county sought a declaratory judgment that each insurer's policies provided coverage for property damage claims arising out of the seepage. The insurers moved for summary judgment on the ground that the county failed to establish that any damage due to the landfill seepage and resultant contamination had been sustained during the effective period of its policies. The circuit court entered summary judgment in favor of the insurer on the ground that any insurance coverage would be triggered upon the manifestation of damage, after the insurer's policies were no longer on the risk.

On appeal, the county argued that the "manifestation" trigger of coverage theory utilized by the circuit court had been rejected by a number of jurisdictions, and that it was contrary

to the rule established in *Lloyd E. Mitchell, Inc. v. Maryland Casualty Company*, 324 Md. 44, 595 A.2d 469 (1991). According to the county, a "continuous" trigger of coverage applied to the environmental property damage in that case, and insurance coverage was triggered "in each period during which damage took place and not only when damage was discovered or became manifest." *Id.* at 430, 610 A.2d at 292. The insurers argued "manifestation" was the appropriate trigger theory for environmental claims, because there was no damage under the policies until damage was actually discovered.

The Court of Appeals held that the circuit court erred in "limiting the trigger of coverage to the time of manifestation or discovery of the property damage," because "occurrence" CGL policies cover "liability inducing events occurring during the policy term." *Harford County*, 327 Md. at 435, 610 A.2d at 294. Recognizing the difficulty in determining precisely when the environmental harm causes property damage, the Court of Appeals concluded that:

> "[M]anifestation" is not the sole trigger of coverage in environmental pollution cases. Rather, ... coverage under the policies may be triggered during the policy period at a time earlier than the discovery or manifestation of the damage.

\* \* \*

The burden to show that property damage occurred within the coverage of the policies is, of course, upon the insured. Whether at any time during the policy period the discharge of contaminants into the soil and underlying groundwater· is of sufficient gravity to prove detectable "property damage" within the policies' definition of that term is quite likely a matter for expert testimony. We decide nothing more in this case than that [the circuit court] was in error in limiting the trigger of coverage to the time of manifestation or discovery of the property damage.

*Id.* at 435–36, 610 A.2d at 294–95; [45] *see also Bausch & Lomb v. Utica Mutual Ins. Co.,* 355 Md. 566, 587–88, 735 A.2d 1081, 1093 (1999). *Harford County,* 327 Md. at 436, 610 A.2d at 295.

## Alternative Trigger of Coverage

The starting point for our analysis must be the language of the policies in question.[46] As set forth above, the American Guarantee CGL policy, as well as the pertinent St. Paul policies, provide that those carriers

> will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because . . . of property damage to which this insurance applies, caused by an occurrence.

American Guarantee primary Policy No. TOP 74 74 079, Section II. St. Paul CGL policy. The insuring agreement for the Zurich umbrella policy for the period September 5, 1980 to September 5, 1981, similarly promises that Zurich

> will indemnify the insured for ultimate net loss in excess of the retained limit hereinafter stated which the insured shall become legally obligated to pay as damages because of . . .

---

**45.** Citing *Harford County, the* North Dakota Supreme Court observed that "[s]everal courts have recognized that interpreting an 'occurrence' policy to provide coverage only when an injury or damage becomes manifest during the policy period unfairly transforms the more expensive 'occurrence' policy into a cheaper 'claims made' policy." *Kief Farmers Cooperative Elevator Co. v. Farmland Mutual Insurance Co.,* 534 N.W.2d 28, 36 (N.D.1995).

**46.** An insurance policy is construed as an ordinary contract, according to "usual, ordinary and accepted meaning [of its terms] unless there is evidence that the parties intended to employ [them] in a special or technical sense." *Dutta v. State Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001). "[I]t is the function of the Court to interpret the policy and decide whether or not there is coverage." *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.,* 324 Md. 44, 56, 595 A.2d 469, 475 (1991) (citation omitted). "Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer." *Dutta,* 363 Md. at 556, 769 A.2d at 957. We must observe rules of construction of ordinary contracts, and will review the policy as a whole to ascertain the intentions of the parties. *See Bausch & Lomb v. Utica Mutual Insurance Co.,* 330 Md. 758, 779, 625 A.2d 1021, 1031 (1993).

property damage ... to which this policy applies, caused by an occurrence.

Zurich umbrella Policy No. 89–28.612.

Both the American Guarantee and St. Paul CGL policies define "occurrence" as an "accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." The Zurich umbrella policy provides a similar definition of occurrence. According to George Tinker in his noted commentary on the CGL policy, "occurrence" is the "keystone to the total coverage structure." Tinker, *ante,* at 231. He emphasizes that the "revised wording [of the 1973 CGL policy] should make clear that the definition encompasses not only the usual 'accident' but also the exposure to conditions which may continue over a long period of time." *Id.*

According to the insurers, *Harford County* does not apply to their specific argument that the manifestation of damage occurs *prior* to the inception of a particular policy, so that policy does not obligate the insurer to indemnify for prior manifested damage.[47] We disagree. The continued presence of ACBMs in the buildings may cause continuous property damage during the coverage periods of policies that take effect subsequent to the moment that the City initially discovered the harmful effects of the asbestos.

▮▮▮ We reject trigger theories that are based exclusively on exposure to harm or the manifestation of injury. The "injury-in-fact" and "continuous" trigger theories are not mu-

---

47. The City argues that the insurers have confused trigger with the "known loss" defense. We disagree. By asserting that any policy which takes effect after the manifestation of the damage in question does not provide coverage, the insurers have advanced what has been described as the "Post Manifestation Cutoff Thesis." *See* Fram, 454 PLI/Lit 9 at * *11–12. This is an argument with respect to trigger of coverage. Because it rests on the manifestation of damage or injury, this argument focuses upon the time of discovery of the damage or injury by the *claimant.* This line of argument is closely related to the "known loss" defense. *See id.* at *26 n. 28.

tually exclusive, but instead may in an appropriate circumstance be complimentary in the appropriate context. As noted by the United States District Court for the Northern District of Ohio:

> With one possible caveat, the appropriate trigger theory for this case is a continuous trigger rule that employs injury-in-fact as the initial triggering event.... The caveat ... is that in order to justify application of the continuous trigger rule, [the insured] has to show that the damage was continuing in nature, as opposed to one-shot or episodic. Otherwise, the policies will be triggered by injury-in-fact.

*GenCorp., Inc. v. AIU Insurance Co.,* 104 F.Supp.2d 740, 746 (N.D.Ohio 2000).

Neither the initial exposure (in this case the installation of asbestos in the City's schools), nor the discovery (manifestation) of the injurious effects of the ACBMs, comports with the "occurrence" language of the CGL policies, which is predicated in part on "the continuous or repeated exposure to conditions" that is implicated by the continuing presence of asbestos in the City's buildings. In *Joe Harden Builders, Inc. v. Aetna Casualty and Surety Company,* 326 S.C. 231, 486 S.E.2d 89 (1997), the South Carolina Supreme Court stated that the theory that "coverage is triggered at the time of the underlying injury-causing event [exposure]" conflicts with the plain language of the CGL policy, which is predicated on covering property damage "which occurs during the policy period." 326 S.C. at 234, 486 S.E.2d at 90; *cf. Owens–Illinois,* 138 N.J. at 452, 650 A.2d at 981–82 (as general rule, time of occurrence of accident is deemed not time of wrongful act but moment plaintiff actually damaged); *see also Gaston County Dyeing Machine Company v. Northfield Insurance,* 351 N.C. 293, 303, 524 S.E.2d 558, 565 (2000); *Abex Corporation v. Maryland Casualty Company,* 252 U.S.App.D.C. 297, 303 n. 26, 790 F.2d 119, 125 n. 26 (1986) ("manifestation" and "exposure" triggers inconsistent with plain meaning of "occurrence"); *American Home Products Corp. v. Liberty Mutual Ins. Co.,* 565 F.Supp. 1485, 1494–95 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984); *see generally Arrow*

*Exterminators, Inc. v. Zurich American Insurance Co.,* 136 F.Supp.2d 1340, 1349 (N.D.Ga.2001)(occurrence policies do not require that property damage become manifest during the period the policy is in force).

The operative terms in these policies are "property damage" and "occurrence." *See* Vernon I. Zvoleff and Alan J. Lazarus, *Trigger of Coverage under Comprehensive General Liability Policies for Product Liability Claims,* in REFERENCE HANDBOOK ON THE COMPREHENSIVE GENERAL LIABILITY POLICY 47, 48 (Peter J. Neeson, ed. [ABA] 1995). "Property damage" is defined in part by the American Guarantee and St. Paul policies as "physical injury to or destruction of tangible property which occurs during the policy period...." The Zurich umbrella policy defines "property damage" in a similar fashion.

▪ We are persuaded that the continued presence of asbestos-containing building materials constitutes "property damage" within the reach of the standard CGL policy. *See Wilkin Insulation Co.,* 144 Ill.2d at 75–76, 161 Ill.Dec. 280, 285–86, 578 N.E.2d at 931–32. As was stated by the New Jersey Supreme Court in *Owens–Illinois:*

> It is recognized that there is a natural deterioration of asbestos-containing materials resulting in the release of fibers, release that may occur by a slow continuous degradation of the insulating surface which may be accelerated by the air movement and vibration which occurs in most buildings. More specifically, friable asbestos material breaks down as a result of vibrations, deterioration, or direct contact and damage and, as it ages, it can lose its cohesive strength. Fallout of fibers from deteriorating material is continuous.

138 N.J. at 455, 650 A.2d at 983 (quoting *Lac d'Amiante du Quebec, Ltee. v. American Home Assurance Co.,* 613 F.Supp. 1549, 1561 (D.N.J.1985)). According to the Illinois Appellate Court:

> The claims seeking coverage for property damage caused by asbestos fiber release are prototypes for the appropriate

application of the equitable continuous trigger. The property damage in the underlying cases, whether from the presence of airborne fibers or settled fibers subject to reentrainment, occurs over a span of time and cannot be linked to or confined to different policy periods.... The precise amount of airborne released fibers and grounded fibers that could be reentrained changes on a continuing basis.

*U.S. Gypsum,* 268 Ill.App.3d at 645–46, 205 Ill.Dec. at 649, 643 N.E.2d at 1256; *see also State v. CNA Insurance Companies,* 172 Vt. 318, 779 A.2d 662, 669–70 (2001); *Eljer Manufacturing, Inc. v. Liberty Mutual Insurance Co.,* 972 F.2d 805, 813–14 (7th Cir.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993); *cf. Armstrong World Industries, Inc. v. Aetna Casualty & Surety Company,* 45 Cal.App.4th 1, 97–98, 52 Cal.Rptr.2d 690, 736–37 (1996) (trial court's finding of continuing damage undisturbed); *accord Board of Education of Township High School, District No. 211 v. International Insurance Co.,* 308 Ill.App.3d 597, 603–04, 242 Ill.Dec. 1, 5–6, 720 N.E.2d 622, 626–27 (1999). Although there is authority to the contrary,[48] we agree with the above quoted language. Thus, we hold that the continuing "injury" persists beyond the point at which the injured party "discovered," or should have discovered, the harmful effects of the ACBMs. *See Lac d'Amiante du Quebec,* 613 F.Supp. at 1561.

Because we conclude that the damage resulting from the presence of ACBMs may persist until removal, we disagree with the insurers' denial of coverage based on the argument that no policy on the risk after manifestation is obligated to indemnify. *See United States Liability Insurance Co. v. Selman,* 70 F.3d 684, 689–90 & n. 7 (1st Cir.1995). We emphasize that expert testimony may be required to quantify, if possible, the nature and extent of continuing damage from asbestos. *See Harford County,* 327 Md. at 436, 610 A.2d at

---

**48.** *See, e.g., Maryland Casualty Co. v. W.R. Grace and Co.,* 23 F.3d 617, 628 (2d Cir.1993), *cert. denied* 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 559 (1994); *accord Stonewall Ins. Co. v. Asbestos Claims Management Corp.,* 73 F.3d 1178, 1209–10 (2d Cir.1995), *modified on other grounds,* 85 F.3d 49 (2d Cir.1996).

295. We hold only that the City is entitled to present evidence in support of its claim that the presence of asbestos has resulted in property damage that continued beyond the date on which the asbestos was discovered.

▮▮▮ We therefore conclude that (1) in the case of long-term, continuous property damage due to the installation of ACBMs and the dynamics of the mineral's continued presence in the buildings' where it was installed, the manifestation trigger is not a correct basis for granting summary judgment to insurers whose policies took effect subsequent to the date on which the asbestos was discovered, and (2) in a claim that results from the presence of asbestos-containing materials in a building, continuous or progressive damage will constitute an "occurrence" within the policy period that the asbestos remains in the City's buildings.

▮▮▮ Applying this holding to the case at bar, we shall vacate the summary judgment entered on the trigger of coverage question in favor of St. Paul, Zurich, and American Guarantee. We remand this matter to the circuit court for proceedings consistent with the above trigger of coverage analysis. On remand, the circuit court shall also consider the defense of known loss.[49] Even though the "known loss" defense is closely related to the manifestation theory pro-

---

**49.** As stated by the Illinois Supreme Court:

By its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur.... If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss [which is ordinarily uninsurable].

*Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 103, 180 Ill.Dec. 691, 697, 607 N.E.2d 1204, 1210 (1992) (emphasis in original). As to the "known loss" and "fortuity" doctrines, the latter "holds that 'insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur.'" The "known loss" rule is a variant, holding that an " 'insured may not obtain insurance to cover a loss that is known before the policy takes effect.' " *National Union Fire Ins. Co. of Pittsburgh, PA. v. The Stroh Companies* 265 F.3d 97, 106 (2d Cir.2001) (citations omitted).

pounded by the insurers, the circuit court must determine its applicability in the first instance.

## Allocation of Liability

Whether this case involves only an injury-in-fact trigger of coverage, or also involves the application of a continuous trigger, we must determine which policies, to what extent, and in which sequence, are applicable to the damages at issue. These are questions of allocation of indemnity liability among the various policies implicated, and of exhaustion. These issues come before us by way of the City's appeal from the summary judgment entered in favor of Federal Insurance Company ("Federal"), which provided Croker with excess liability insurance coverage for the period from July 31, 1984 up to and including May 1, 1985. Pursuant to this policy, Federal agreed

> to pay on behalf of the insured LOSS resulting from any occurrence insured by the terms and provisions of the First UNDERLYING INSURANCE policy scheduled in Item 6 of the Declarations (except for the Limits of Liability and defense provisions, if any). The insurance afforded by this policy shall apply only in excess of and after the UNDERLYING INSURANCE (as scheduled in Item 6 of the Declarations) has been exhausted.

Federal Excess Liability Policy No. 7929–20–01.[50] The first underlying policy was issued to Croker by St. Paul, and

---

**50.** Excess liability insurance "covers occurrences covered by the primary policy but exceeding the liability limits of the primary policy." *Megonnell v. United States Automobile Ass'n,* 368 Md. 633, 644, 796 A.2d 758, 765 n. 6, (2002). *See United States Fire Insurance Co. v. Maryland Casualty Co.,* 52 Md.App. 269, 271–2, 447 A.2d 896, 897–98 (1982). In general, companies would purchase excess coverage to protect themselves from "catastrophic loss." Scott M. Seaman and Charlene Kittredge, *Excess Liability Insurance: Law and Litigation,* 32 TORT & INS. L.J. 653, 656 (1997); *see generally,* Douglas R. Richmond, *Rights and Responsibilities of Excess Insurers,* 78 DENV. L.REV 29, 32 (2000); Jeffrey T. Kraus., *"Drop Down" Liability of the Excess Insurer: Consumerism v. Commercial Reality,* 17 N.KY. L.REV 353, 353 (1990). *See Fried v. North River Ins. Co.,* 710 F.2d 1022, 1026 (4th Cir.1983) (whole concept of umbrella policies to provide inexpensive coverage for

presented limits of $2,000,000 per occurrence and $2,000,000 in an annual aggregate. The Federal excess policy provided for indemnity in the amount of 100 percent of the loss in excess of the underlying insurance up to $8,000,000 per occurrence and $8,000,000 as an annual aggregate.

Federal Insurance Company moved for summary judgment on the basis that "the City has not demonstrated that Federal's policy for the period July 31, 1984 through May 1, 1985 has been triggered or is capable of being reached and cannot establish that property damage, if any, occurred during Federal's policy period." The thrust of Federal's argument is that the numerous first-level and other underlying policies would necessarily respond before Federal's second-tier excess policy would be obligated to answer to Croker's liabilities. Federal argues that indemnification made pursuant to these underlying policies would cancel the full liability amount to which the City would be entitled pursuant to its settlement with Croker.

Judge Strausberg granted Federal's motion, explaining:

Federal asserts that the City cannot prove that more than the primary policy amount (which is either $2 million or $2.5 million) of property damage occurred during the applicable term of the Federal policy, July 31, 1984, to May 1, 1985. Generally, an excess carrier has no liability until the primary policy is exhausted. *United States Fire Ins. Co. v. Maryland Casualty Co.*, 52 Md.App. 269, 271–2 [447 A.2d 896] (1982). It is significant that Federal's excess policy would not come into play unless there was a judgment of at least $2 million. That the damages during the applicable period of Federal's policy would exceed the primary coverage and trigger the excess coverage is questionable.

City's reliance on *North American Philips Corp. v. Aetna Casualty and Surety Co.*, 565 A.2d 956 (Del.Super.1989) is misplaced. While that case dealt with potential liability in excess carriers, it was in the context of whether or not there

unusual catastrophic losses above limits of conventional primary coverage). *See also Whitehead v. Fleet Towing Co.*, 110 Ill.App.3d 759, 764, 442 N.E.2d 1362, 1366, 66 Ill.Dec. 449 (1982).

was a justiciable controversy in a declaratory judgment action.

Memorandum Opinion at 30 (May 16, 2000).

On appeal, the City argues that the court's own language underscores the factual uncertainty of whether the Federal policy would be reached—a question of material fact in the City's view. For the reasons that follow, we will affirm the entry of summary judgment in favor of Federal.

We hold that (1) the obligation to indemnify the insured under the circumstances of this case, which involves continuing asbestos product property damage, is to be prorated among all carriers based on their time on the risk, (2) the "joint and several" or "all sums" allocation method is incompatible with the injury-in-fact/continuing trigger that is applicable to the case at bar, (3) an insured who elects not to carry liability insurance for a period of time, either by electing to be self-insured, or by purchasing a policy which withholds coverage pursuant to a particular exclusion, as in the case of the products hazard exclusions found in this case, will be liable for the prorated share that corresponds to periods of self-insurance or no coverage, and (4) the concept of "horizontal exhaustion" is applicable in this instance.

We take this approach because it conforms with the realities of long term property damage resulting from asbestos in buildings, and the application of the injury in fact/continuous trigger of coverage. With respect to the horizontal exhaustion issue, the City as a party that steps into the place of the insured, must exhaust all primary insurance before seeking indemnity from excess insurers. Excess insurance will come into play if and only if the underlying policies have been exhausted, i.e., only after the primary carriers, or self-insurers, have fulfilled their respective obligations.

In *Keene Corporation v. Insurance Company of North America*, 215 U.S.App.D.C. 156, 667 F.2d 1034 (1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 1645, 71 L.Ed.2d 875 (1982), the United States Court of Appeals for the District of Columbia Circuit considered a case in which it was likely that

coverage from more than one insurer would be triggered, and concluded that:

> The only logical resolution of this issue is for Keene to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury. That is the only way that Keene can be assured the security that it purchased with each policy.

215 U.S.App.D.C. at 172, 667 F.2d at 1050. Advocates of this view of allocation contend that each policy promises full indemnification to the insured for all liability, "all sums," resulting from an occurrence.[51]

In *Keene,* Judge Bazelon noted that while full indemnification liability attached to each liability policy, the "other insurance clauses" in the other liability policies would result in contribution and shared defense costs from other carriers whose policies were also triggered. *Id.* Finally, under the "joint and several" allocation theory, the insured would be entitled to choose, in its discretion, which insurer which would be required to respond to the full liability. *See generally American National Fire Insurance Co. v. B & L Trucking and Construction Co.,* 134 Wash.2d 413, 951 P.2d 250 (1998). *See* Thomas M. Jones and Jon D. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple–Trigger Cases,* 10 VILL ENVTL. L.J. 25, 40–42 (1999).

We disagree with the approach taken in *Keene,* and the "all sums" and "joint and several approach" in general.[52] We are persuaded that the "all sums" language of the stan-

---

**51.** The standard CGL form generally provides that the insurer will "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages[.]" This coverage statement, for example, is found in the Zurich policy TOP 74 74 079, effective September 5, 1979.

**52.** The *Keene* court did not apply the law of any particular state in its analysis of the CGL policy, which it considered to be ambiguous. As later noted by the D.C. Circuit "[t]he central basis for the *Keene* holding ... was the panel's conclusion that their central objective 'must be to

dard CGL policy must be read in concert with other language that limits a policy's liability for damage or loss that occurs during the policy period, and concur with the following analysis of the Supreme Court of Colorado:

> At the time [the insured] purchased each individual insurance policy, we doubt that [it] could have had a reasonable expectation that each single policy would indemnify [it] for liability related to property damage occurring due to events taking place years before and years after the term of each policy.... [T]here is no logic to support the notion that one single insurance policy among 20 or 30 years worth of policies could be expected to be held liable for the entire time period.

*Public Service Company of Colorado v. Wallis and Companies*, 986 P.2d 924, 940 (Colo.1999). To compress long-term damage of a continuing nature into a single policy period, which would effectively be called for under the "joint and several" or "all sums" approach, is "intuitively suspect." *Olin Corp. v. Insurance Co. of North America*, 221 F.3d 307, 322–23 (2d Cir.2000) (quoting *Dicola v. American S.S. Owners Mut. Protection & Indem. Ass'n., Inc.*, 158 F.3d 65, 82 (2d Cir.1998)). *See contra, Hercules, Inc. v. AIU Insurance Company*, Del.Supr., 784 A.2d 481, 489 (2001) (pro rata allocation inconsistent with "all sums" provisions).

---

give effect to the policies' dominant purpose of indemnity.' " *Abex Corp. v. Maryland Cas. Co.*, 252 U.S.App.D.C. 297, 304 n. 35, 790 F.2d 119, 126 n. 35 (1986). Applying New York law, the *Abex* panel noted federal case law from the Second Circuit that was critical of *Keene's* approach. *Id.*, citing *American Home Products v. Liberty Mutual Ins. Co.*, 565 F.Supp. 1485, 1510–11 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2d Cir.1984). Judge Wald, concurring in *Keene*, was critical of the majority's approach to allocation which would relieve asbestos manufacturers of liability even for periods when they did not purchase insurance. She stated:

> I just do not understand why an asbestos manufacturer, which has consciously decided not to insure itself during particular years of the exposure-manifestation period, should have a reasonable expectation that it would be exempt from liability for injuries that were occurring during the uninsured period.

*Keene*, 215 U.S.App.D.C. at 180, 667 F.2d at 1058 (Wald, J., concurring).

The New York Court of Appeals has recently adopted a pro rata allocation in an action involving long-term environmental pollution:

> Joint and several allocation in the present factual setting is inconsistent with the unambiguous language of the policies before us. Con Edison concedes that it is impossible to determine the extent of the property damage that is the result of an occurrence in a particular policy period. Indeed, its theory of the case was that while the plant was in operation—long before any of the policies were issued—there were leaks, spills and drips that eventually migrated to the groundwater. Con Edison planned to establish that the dispersion of the pollutants was a gradual, continuous process, thus creating an inference that there was an accident or occurrence during each and every policy period, though there is no evidence of an accident during any particular policy period.
>
> Con Edison wants to combine this uncertainty-based approach, which implicates many successive policies, with an entitlement to choose a particular policy for indemnity. Yet collecting all the indemnity from a particular policy presupposes ability to pin an accident to a particular policy period (*see Sybron Transition Corp.[ v. Security Ins. of Hartford]*, 258 F.3d [595] at 601 [ (2001) ]; *Owens–Illinois*, 138 N.J. at 465 [650 A.2d 974] ). Although more than one policy may be implicated by a gradual harm (*see e.g. McGroarty v. Great Am. Ins. Co.*, 36 N.Y.2d 358, 365 [368 N.Y.S.2d 485, 329 N.E.2d 172] ), joint and several allocation is not consistent with the language of the policies providing indemnification for "all sums" of liability that resulted from an accident or occurrence *"during the policy period"* (see *Olin Corp.*, 221 F.3d 307, 323).
>
> Pro rata allocation under these facts, while not explicitly mandated by the policies, is consistent with the language of the policies. Most fundamentally, the policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that

period (*see Forty–Eight Insulations, Inc.*, 633 F.2d at 1224). Con Edison's singular focus on "all sums" would read this important qualification out of the policies. Proration of liability among the insurers acknowledges the fact that there is uncertainty as to what actually transpired during any particular policy period (*see Sybron Transition Corp.*, 258 F.3d at 602).

*Consolidated Edison Company of New York, Inc. v. Allstate Insurance Company*, 98 N.Y.2d 208, 224, 746 N.Y.S.2d 622, 630, 774 N.E.2d 687, 695 (2002) (footnotes omitted).

█ In this case, we conclude that pro-rata allocation by "time on the risk" is more consistent with the injury-in-fact/continuous trigger of coverage employed here. *See Insurance Company of North America v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1225 (6th Cir.1980), *clarified,* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *see also Public Service Company of Colorado,* 986 P.2d at 941–43; *Stonewall Insurance Company,* 73 F.3d at 1201–05; *Northern States Power Company v. Fidelity and Casualty Company of New York,* 523 N.W.2d 657, 663 (Minn.1994). "Each insurer is liable for that period of time it was on the risk compared to the *entire* period during which damages occurred." *Domtar, Inc.*, 563 N.W.2d at 732–33.

█ This method of allocation apportions the indemnity risk in a manner that is consistent with the manner in which coverage is triggered. The "choice of trigger theory is related to the method a court will choose to allocate damages between insurers." *Northern States Power Co.*, 523 N.W.2d at 662.[53] Further, losses will be prorated to the insured, unless a gap in coverage is due to the insured's inability to obtain insurance.[54]

───────────

**53.** *But see Public Service Company of Colorado v. Wallis and Companies,* 986 P.2d 924, 941 (Colo.1999) (use of continuous trigger neither requires nor precludes use of pro-rata allocation by time on risk).

**54.** As rehearsed by the Second Circuit, "proration-to-the-insured is a sensible way to adjust the competing contentions of the parties in the

This straightforward method accommodates the need to hold liable those businesses that chose not to purchase insurance or coverage, or to self-insure.[55] *See Public Service Company of Colorado*, 986 P.2d at 940. While this formula does not address any variations in policy limits, no policy would be required to exceed its indemnification limits in any event.

### Exhaustion

We must next address the question of exhaustion, or "[the] order in which a court will decide to [collect from, or deplete the indemnification liabilities of] the policies at issue." *See* Thomas M. Jones and Jon D. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple Trigger Cases*, 10 VILL. ENVTL. L.J. 25, 31 (1999). Within the meaning of an excess policy, "exhaustion" does not occur until the limits of underlying insurance have been met. *New Process Baking Co. v. Federal Insurance Co.*, 923 F.2d 62, 63 (7th Cir.1991). "A primary insurer that properly pays its policy limits is said to have 'exhausted' its limits." Douglas R. Richmond, *Rights and Responsibilities of Excess Insurers*, 78 DENV. L.REV. 29, 77 (2000).

> One of the most hotly contested issues in continuous loss cases, often referred to by insurers as "long-tail claims," is whether an insured is obligated to exhaust its liability coverage "vertically" or "horizontally." This issue arises

context of continuous triggering of multiple policies over an extended span of years." *Stonewall Insurance Co. v. Asbestos Claims Mgt. Corp.*, 73 F.3d 1178, 1203 (2d Cir.1995), *modified on other grounds*, 85 F.3d 49 (2d Cir.1996). We further agree that such allocation would not be appropriate in that case where coverage was not available. *Id. See also Owens–Illinois, Inc. v. United Insurance Co.*, 138 N.J. 437, 479, 650 A.2d 974, 995 (1994). We stress, however, that a policyholder's decision not to purchase coverage for a particular risk, such as a products hazard, does not render that coverage "unavailable" for purposes of assessing "proration-to-the-insured."

**55.** For clarity, we do not apply the pro-rata allocation method employed by the New Jersey Supreme Court, which was "proration on the basis of policy limits, multiplied by years of coverage." *See Owens–Illinois*, 138 N.J. at 475, 650 A.2d at 993.

when several primary policies or lower level excess policies are triggered, and a court must determine whether the limits of the underlying policies for one year (vertical exhaustion) or all years (horizontal exhaustion) must be exhausted before a particular excess policy must pay.

Richmond, *Rights and Responsibilities*, 78 DENV. L.REV. at 78. We hold that "horizontal exhaustion" is the best fit for the realities of cases of this nature.

The exhaustion of all of the primary policies on the risk should occur prior to the requirement that any excess policy respond to the loss, unless the language of the excess policy states that (1) it is excess insurance over a particular, specific, primary policy, and (2) will be triggered when that discrete policy is exhausted. *See Community Redevelopment Agency of the City of Los Angeles v. Aetna Casualty and Surety Company*, 50 Cal.App.4th 329, 339–40 & n. 6, 57 Cal.Rptr.2d 755, 760–61 & n. 6 (1996).

This "horizontal exhaustion" is consistent with our application of the continuous trigger and pro-rata allocation. *See* Richmond, *Rights and Responsibilities*, 78 DENV. L.REV. at 79. Within the context of the allocation and exhaustion methods as applied to the primary policies, each excess carrier would look to whether the coverage of the underlying policy was exhausted before responding. *See Community Redevelopment Agency*, 50 Cal.App.4th at 340 n. 6, 57 Cal.Rptr.2d at 761 n. 6.

Because the allocation will be based on the time on the risk, some primary policies that provide less coverage will be exhausted sooner than others, and their excess insurers, if any, would accordingly have to respond at an earlier point. This is consistent with the expectation of the parties that a higher tier of coverage would be reached only when the limits of the primary policy had been exhausted.

Applying our conclusions to the City's appeal of the entry of summary judgment in favor of Federal Insurance, it is evident that the amount of the City's settlement with Croker, when apportioned over the years beginning with 1965 (at which point Croker apparently was self-insured), and continuing at

least through May 1, 1985 (when Croker was last insured), will not exhaust the primary policies. We therefore affirm the circuit court's entry of summary judgment in favor of Federal Insurance Company on the issue of exhaustion.[56]

## APPEAL BY THE MAYOR AND CITY COUNCIL OF BALTIMORE FROM THE CIRCUIT COURT'S ORDER VACATING ITS PREVIOUS DENIAL OF GARNISHEES' MOTION TO REVIEW CONSENT JUDGMENT DISMISSED; APPEAL BY THE MAYOR AND CITY COUNCIL OF BALTIMORE FROM THE CIRCUIT COURT'S

---

**56.** Our Court of Appeals recently decided *Megonnell v. United States Automobile Ass'n*, 368 Md. 633, 796 A.2d 758 (2002). The Court there held, *inter alia*, that the excess coverage section of an umbrella automobile liability policy was required to drop down to indemnify for liability to a family member that was excluded from coverage under the primary policy by a household exclusion. The Court explained that while the household exclusion removed the loss in question from the primary policy, the umbrella's excess section did not "follow form," and thus did not have the benefits of the household exclusion. The Court held that:

> [I]n order for the excess coverage to be "follow form" from the primary policy, thereby making the household exclusion applicable, there would, at the least, need to be a conspicuous, clear and express clause that incorporated the exclusions of the primary policy into the umbrella policy.

*Id.* at 657, 796 A.2d at 773.

*Megonnell* does not require us to re-examine our disposition of any issues in this case. The issue is not squarely raised, but we note it in passing because this litigation will continue. We have examined the brief excess policy issued by Federal, and are satisfied that it is a "follow form" instrument. The Federal policy reads in part that Federal "agrees to pay on behalf of the insured LOSS resulting from any occurrence insured by the terms and provisions of the First UNDERLYING INSURANCE[.]" This is not an academic exercise, because the presence of products exclusions in the primary policies in this litigation may tempt a party seeking indemnification to look to excess policies that may have been carelessly drafted so as not to "follow form," and thus not benefit from the exclusion. *See Megonnell*. We do note some disapproval of the concept that pure excess policies be required to drop down to primary levels. As stated by the Fifth Circuit in a slightly different context:

> [I]t is logical to assume that affordable and socially desirable catastrophic insurance would be difficult to obtain ... if we were loosely to allow transformation of umbrella policies because of boilerplate "other insurance" clauses in primary policies.

*Truehart v. Blandon*, 884 F.2d 223, 228 (5th Cir.1989).

ORDER STRIKING PLAINTIFF'S JURY DEMAND DISMISSED; GARNISHEES' MOTION TO DISMISS CITY'S APPEALS FROM SUMMARY JUDGMENTS DENIED; CIRCUIT COURT'S ENTRIES OF SUMMARY JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; CROSS–APPEALS BY UTICA MUTUAL INSURANCE COMPANY DISMISSED; EACH PARTY TO PAY ITS OWN COSTS.